**SOUTH LOUISIANA GRAIN SERVICES, INC., et al., Plaintiffs,**

v.

**Bob BERGLAND, Secretary of Agriculture, et al., Defendants.**

Civ. A. No. 77–2058.

United States District Court,
District of Columbia.

Jan. 31, 1978.

Pierre J. LaForce, Edward M. Fogarty, Washington, D. C., for plaintiffs.

Michael I. Gewirtz, Asst. U. S. Atty., Washington, D. C., for defendants.

OPINION

JUNE L. GREEN, District Judge.

Plaintiffs in this case have sued for injunctive and declaratory relief against implementation of certain sections of the United States Grain Standards Act of 1976, 7 U.S.C. §§ 71–87h. For the reasons given below, the Court denies the requested relief.

I.

The material facts of this case are not in dispute. Since 1916 federal law has required that all American grain shipped in interstate or foreign commerce be inspected and graded in accord with standards promulgated by the United States Secretary of

Agriculture. Since that time a grain inspection industry comprised of so-called "official inspection agencies" has developed. In some geographical areas, these agencies have been operated by state governmental units; in some areas, by boards of trade, chambers of commerce and other trade organizations; and in still other areas, by independent private corporations. Plaintiff South Louisiana Grain Services, Inc., is a private corporation of this nature. In all cases inspection activities have been conducted by individuals who are licensed by the Secretary of Agriculture and who work for the various official inspection agencies.

During 1973 and 1974, reports of irregular practices in the federal grain inspection system led to investigations by the Federal Bureau of Investigation, the Department of Agriculture, and various United States Attorneys' offices. In addition, Committees of both Houses of Congress undertook their own examinations of the system.

In 1974, a federal grand jury investigation was initiated by the United States Attorney for the Eastern District of Louisiana, for the purpose of investigating alleged irregularities in connection with the inspection and weighing of grain in the New Orleans area. The publicity which attended the ensuing New Orleans grain scandals attracted widespread attention. On June 4, 1975, Senator Hubert H. Humphrey introduced legislation aimed at reform of the inspection and weighing system. On June 4, 1975, Senator Humphrey and Representative Thomas S. Foley, Chairman of the House Committee on Agriculture, wrote a letter to Comptroller General Elmer B. Staats stating, "The current grain inspection scandal is a matter that deserves the immediate attention of Congress. It threatens the credibility of the United States as the largest exporter of agricultural commodities in the world." The letter went on to request a "full and complete evaluation" of the marketing and inspection process for grain, with particular emphasis on the export trade.

At the time of the dispatch of the letter, the Senate and House began hearings on the scandals and on proposals for reform of weighing and inspection services. On February 17, 1976, the GAO issued its report. The agency recommended "that Congress establish essentially a Federal grain inspection system." General Accounting Office, Report on Irregularities in the Marketing of Grain, 94th Cong., 2d Sess. (February 17, 1976) at 44. The Agency also recommended,

In phasing in a federally operated inspection system a high priority should be given to establishing Federal inspection services at all port elevators, since recent disclosures of extensive criminal abuses and other shortcomings in the inspection system have involved port elevators primarily. Also, prolonging or postponing the development of a reliable inspection system at such elevators could have a lasting effect on foreign sales. Id. at 43.

Congress enacted the United States Grain Standards Act of 1976 on October 21, 1976. The law as enacted federalized the entire grain inspection and weighing system throughout the country. The law provided that at export locations, all inspection and weighing would be performed by federal employees except in those states declared eligible by the Secretary of Agriculture to be delegated authority to undertake these activities. With regard to services at inland ports, the law required a study of the system in order to provide information for use by Congress in evaluating the needs of the inspection and weighing systems at these points. 7 U.S.C. § 79, note.

As written, the Act provided for phasing in the federalized services at the export locations over a two-year period. On December 1, 1977, plaintiffs in this case filed this action. On December 2, 1977, the Court denied their motion for a temporary restraining order enjoining defendants from federalizing plaintiffs' activities, which occurred hours after the hearing. The Court then scheduled oral argument for December 20 on plaintiffs' motion for a preliminary injunction. At the outset of the hearing, plaintiffs moved to style the proceedings as one involving a request for

permanent injunctive and declaratory relief. The Court granted plaintiffs' request. After hearing argument from all parties, the Court denied plaintiffs the relief they had sought. This opinion and order concludes the matter.

## II.

■ At the time of the oral argument on December 20, plaintiffs' business activities had been federalized and the request for injunctive relief was moot. In oral argument, plaintiffs' counsel indicated that the relief then sought was a declaratory judgment that the plaintiffs' business should be defederalized and that the government was "required to give us back our facilities upon our return of the money that they paid." (Transcript of December 20 hearing at 11.)

Plaintiffs mount two legal challenges to the Grain Standards Act as it has applied to South Louisiana Grain Services as a corporation and to Mr. John A. Williamson, Jr., as its individual chief officer. Their primary contention is that the Act constitutes a Bill of Attainder in violation of Article I, Section 9, Clause 3 of the Constitution. Their secondary contention is that the Act violates plaintiffs' Fifth Amendment rights of substantive due process.

A Bill of Attainder is "a law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial." *Nixon v. Administrator of General Services*, 433 U.S. 425, 468, 97 S.Ct. 2777, 2803, 53 L.Ed.2d 867, 907 (1977).

The Courts are to employ three criteria in analyzing whether a legislative enactment is a Bill of Attainder. First, the Court must find that the legislative act "imposes . . . punishment traditionally judged to be prohibited by the Bill of Attainder Clause." *Nixon*, at 475, 97 S.Ct. at 2806, 53 L.Ed.2d at 911. The Supreme Court's comments on this test are illuminating. In the *Nixon* case, the Court found that appellant had not been singled out for punitive reasons but "constituted a legitimate class of one." *Id.* at 472, 97 S.Ct. at 2805, 53 L.Ed.2d at 909. This provided "a basis for

Congress' decision to proceed with dispatch with respect to his materials [while] ordering the further consideration of generalized standards to govern his successors." *Id.*

The Court went on to say:

Appellant's characterization of the meaning of a bill of attainder obviously proves far too much. By arguing that an individual or defined group is attainted whenever it is compelled to bear burdens which the individual or group dislikes, appellant removes the anchor that ties the bill of attainder guarantee to realistic conceptions of classification and punishment. His view would cripple the very process of legislating, for any individual or group that is made the subject of adverse legislation can complain that the lawmakers could and should have defined the relevant affected class at a greater level of generality. Furthermore, every person or group made subject to legislation which it finds burdensome may subjectively feel, and can complain, that it is being subjected to unwarranted punishment. *United States v. Lovett, supra* [328 U.S. 303] at 324, 66 S.Ct. 1073, 90 L.Ed. 1252 (Frankfurter, J., concurring). However expansive is the prohibition against bills of attainder, it surely was not intended to serve as a variant of the Equal Protection Clause, invalidating every act of Congress of the States that legislatively burdens some persons or groups but not all other plausible individuals. In short, while the Bill of Attainder Clause serves as an important "bulwark against tyranny," *United States v. Brown, supra*, [381 U.S. 437] at 443, 85 S.Ct. 1707, 14 L.Ed.2d 484, it does not do so by limiting Congress to the choice of legislating for the universe, or legislating only benefits, or not legislating at all. *Id.* at 470, 97 S.Ct. at 2804, 53 L.Ed.2d at 908.

The test of permissible specificity is whether "viewed in context, the focus of the enactment can be fairly and rationally understood." *Id.* at 470–71, 97 S.Ct. at 2805, 53 L.Ed.2d at 909.

In this case the corporate and individual plaintiffs have not been singled out for punitive legislative action. As of December 15, 1977, all grain inspection and weighing facilities in 13 port locations had been federalized and facilities in Pennsylvania and Baltimore were scheduled for federalization by February of this year. The scandals which prompted federal prosecutions and Congressional investigations occurred at export locations. The General Accounting Office determined that interests of foreign commerce required that inspection reform begin at points of export. The Grain Standards Act contemplates further federalization at inland locations while directing the government to proceed with dispatch regarding the centers of controversy. The focus of this enactment can be fairly and rationally understood and the first test for exempting a legislative act from Bill of Attainder status is satisfied.

The *Nixon* case's second test is "whether the law under challenge, viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes." *Id.* at 475, 97 S.Ct. at 2807, 53 L.Ed.2d at 911.

In light of the prosecutorial work of the Department of Justice the investigatory findings of the General Accounting Office, and the information gathered in Congressional hearings, the decision of the legislation's drafters to concentrate the bill's more immediate effects on export locations appears well considered. Our country's increasing dependence on food exports as a means of rectifying balance of payments problems arising from energy imports is a matter of general knowledge.

The third test "is strictly a motivational one: inquiring whether the legislative record evinces a congressional intent to punish." *Id.* at 475, 97 S.Ct. at 2808, 53 L.Ed.2d at 913. As in the case of the legislation considered in the *Nixon* decision, here the "legislative history leads to only one conclusion, namely, that the Act before us is regulatory and not punitive in character." *Id.* Additional indications exist that the bill is not intended to punish individual employees

of South Louisiana Grain Services. Mr. Leland E. Bartelt, Administrator of the newly created Federal Grain Inspection Service, indicated in an affidavit to the Court that as of December 19, 1977, the Service had offered employment to 68 former employees of South Louisiana, and approximately 46 had accepted. In addition, the Service has purchased approximately $19,451 worth of equipment from South Louisiana. Mr. Bartelt indicated that the Service had offered to purchase all of the equipment South Louisiana was willing to sell, but was outbid by operators of private grain elevators on a number of items.

Mr. Williamson, the individual plaintiff, has similarly failed to demonstrate a punitive motivation. He himself indicated that employment with the Service has not been ruled out by the federal administrators involved. In an affidavit to the Court dated November 30, 1977, he stated:

> Personally speaking, I will be foreclosed from practicing my profession in the private sector. I find the prospect of working for the FGIS singularly unappealing. The highest GS rating I have heard being offered by the FGIS is a GS–11, a rank I held some fourteen years ago when I left the Department of Agriculture.

### III.

As a secondary claim, plaintiffs allege that certain sections of the Grain Standards Act operate to deprive plaintiffs of liberty and property without the due process protections guaranteed by the Fifth Amendment. In particular, they charge the statute bears no rational relationship to a legitimate legislative objective. Moreover, they charge the Act unlawfully discriminates between inspection and weighing agencies at export locations and those at interior points, and also between private and State-operated agencies at the export locations.

The claim of irrational relationship has been answered by the Court's discussion of the Bill of Attainder issue. The Court has also found the basis for the Act's focus on

export locations to be sound. Finally, the Court finds the distinctions drawn in the regulatory scheme between treatment of private and State-operated agencies to be justified. The State-operated entities are already under direct governmental control, and are permitted to continue without federalization only by satisfying criteria imposed by the Service. Conversion of the private agencies into governmental entities brings them into parity of status with these State-operated enterprises.