**SOUTH LOUISIANA GRAIN SERVICES, INC., John A. Williamson, Jr., Appellants,**

v.

**Bob BERGLAND, Secretary of Agriculture, U.S. Department of Agriculture, et al.**

No. 78–1132.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 19, 1978.

Decided Dec. 21, 1978.

---

Pierre J. LaForce, Washington, D. C., with whom Edward M. Fogarty, Washington, D. C., was on brief, for appellants.

Kenneth M. Raisler, Asst. U. S. Atty., with whom Earl J. Silbert, U. S. Atty., John A. Terry, Michael W. Farrell, Asst. U. S. Attys., and James Michael Kelly, Asst. Gen. Counsel, Dept. of Agriculture, Washington, D. C., were on brief, for appellee.

David G. Hetzel, Asst. U. S. Atty., Washington, D. C., entered an appearance for appellee.

Before ROBINSON, MacKINNON and ROBB, Circuit Judges.

Opinion for the court Per Curiam.

PER CURIAM:

Appellant South Louisiana Grain Services, Inc., a privately-owned grain inspection and weighing concern, filed suit in federal district court challenging as unconstitutional the basic provisions of the United States Grain Standards Act of 1976 (the "1976 Act"), 7 U.S.C. §§ 71–87h. Enacted in the wake of a scandal involving corruption in the then existing federal grain inspection system, the 1976 Act, among other things, established the Federal Grain Inspection Service ("Service") and provided

that the official inspection and weighing of grain at all export port locations be done by government employees designated or directly employed by the new agency. Appellant, which had been licensed to conduct official inspections under the old system, argued that the 1976 Act constitutes a bill of attainder proscribed by Art. I, § 9, of the Constitution, and in addition violates the due process clause and equal protection component of the fifth amendment. The district court, in an opinion and order issued on January 30, 1978, denied the appellant's request for declaratory relief and granted the Government's motion for summary judgment. *South Louisiana Grain Services, Inc. v. Bergland*, 463 F.Supp. 783 (D.D.C. 1978).

We affirm, and in so doing, we substantially adopt the reasoning and conclusions of the district court. Specifically, we endorse the court's rejection of appellant's fundamentally misconceived analysis of the Bill of Attainder Clause and its inordinately restrictive view of the congressional power to regulate foreign commerce. We write only to emphasize one consideration not mentioned by the district court which we believe goes to the heart of the reasonableness of the 1976 Act.

In brief, that consideration entails an understanding of the activity regulated by the 1976 Act as well as its predecessor statutes, namely, the *official* inspection of grain. The whole point of the prior system was to regulate the performance of what is essentially a government function by, *inter alia*, privately operated agencies. The legislative history of the 1976 Act repeatedly

and unmistakably indicates that, as Congress decided, the old system in operation was inherently unsatisfactory in carrying out the official inspection of grain. The General Accounting Office Report on the system,[1] the testimony adduced at the extensive hearings on the 1976 Act,[2] and the conclusions of the committee reports[3] all stress as a major flaw of the prior system the close commercial relationship between the agencies ostensibly performing a government function and the sellers whose grain was being officially graded. The GAO Report found:

> Although some inspection services have been satisfactory, the [old grain inspection] system generally has:
>
> Operated without effective controls, procedures, or lines of authority;
>
> Tolerated conflicts of interest between the grain inspection and merchandising operations; and
>
> Not been responsive to the limited supervision provided by the Department's Agricultural Marketing Service.[4]

Among the witnesses testifying at the hearings on reform of the inspection system was the Government prosecutor who had investigated the reports of irregular practices. Asked if the defects were simply a problem of a few "rotten apples," he replied:

> Senator, we have given that some very serious thought. We have concluded the fault is within the system.[5]

Earlier, the same witness had explained:

> The fault [in New Orleans] is just like, it would seem to me, the fault throughout

1. General Accounting Office, *Report on Irregularities in the Marketing of Grain*, 94th Cong., 2d Sess. (1976).

2. *See, e. g. Hearings on H.R. 9467 and Similar Bills Before the House Comm. on Agriculture*, 94th Cong., 1st Sess. (1975); *Hearings Before the Subcomm. on Foreign Agricultural Policy and the Subcomm. on Agricultural Production, Marketing and Stabilization of Prices of the Sen. Comm. on Agriculture and Forestry on Grain Inspection Irregularities and Problems*, 94th Cong., 1st Sess. (1975) (hereafter *Senate Hearings*).

3. *See, e. g.*, H.R.Rep.No.966, 94th Cong.; 2d Sess. 35 (1976); S.Rep.No.747, 94th Cong., 2d Sess. 41 (1976), *reprinted in* [1976] U.S.Code Cong. & Admin.News, pp. 6522, 6558–59.

4. Digest of the GAO Report, S.Rep.No.747, 94th Cong., 2d Sess. 12, *reprinted in* [1976] U.S.Code Cong. & Admin.News, p. 6530.

5. *Senate Hearings*, *supra* note 2, at 35. Pertinent excerpts of the testimony are contained in S.Rep.No.747, 94th Cong., 2d Sess. 40–42, *reprinted in* [1976] U.S.Code Cong. & Admin. News, pp. 6558–59.

the system. It is in the *intimate relationship, the mutuality of interests, that has developed between the elevator companies and the inspection agencies*, where the personnel of the inspection agencies, in effect, feel that they are serving the elevator. We have yet to see any real recognition in the private inspection agency personnel that their loyalty is to the United States of America. They don't realize that they are performing a very sensitive and important governmental function, that is, to make official inspections. This is a sad thing, a tragic thing.[6] (Emphasis added.)

The Senate Report on the 1976 Act restated these conclusions, noting:

The fault throughout the system is in the development of intimate relationships and mutuality of interest between grain companies and the inspection agencies. Thus, many inspection personnel feel that their loyalty is to the grain company they are supposed to be supervising and not to the United States.[7]

▇ Appellant's contention, invoked in both its bill of attainer and fifth amendment analysis, that the 1976 Act unreasonably discriminated against private inspection agencies while permitting some Service-approved state agencies to continue to conduct official inspections, completely ignores the congressional desire to interpose a noncommercial factor into the official inspection process. Congress found that the allegiances of the private inspection agencies were misplaced, and set out to replace the system under which those agencies operated with a new system of direct federal controls. It was eminently reasonable for Congress to want those conducting a government function to feel responsible to the federal government, and the means it chose, chiefly creation of the Service, were reasonably related to accomplishing that purpose. That Congress chose to continue to allow private inspection at interior stations in no

way suggests that the ban on private inspection at ports was improperly motivated. Congress acted well within its authority in determining that the balance of payments deficit and the need to maintain good relations with foreign countries necessitates greater control over inspection of grain bound for export.

With the foregoing additional comments, we affirm the judgment of the district court.

*Judgment accordingly.*

---

6. *Id.* at 27.

7. S.Rep.No.747, 94th Cong., 2d Sess. 6, *reprinted in* [1976] U.S.Code Cong. & Admin.News, p. 6525. The strong conflict of interest provision

contained in the 1976 Act, 7 U.S.C. § 87, reflects the congressional concern with the misplaced loyalties of the official inspection personnel.