**SOUTH LOUISIANA GRAIN
SERVICES, INC.**

v.

**The UNITED STATES.**

No. 31–81C.

United States Claims Court.

Nov. 2, 1982.

George Pivach, II, Belle Chasse, La., for plaintiff; Molony, Nolan, North & Riess, Gretna, La., of counsel.

Stephen Altman, Washington, D.C., with whom was J. Paul McGrath, Asst. Atty. Gen., Washington, D.C., for defendant; John Donnaud, Washington, D.C., of counsel.

OPINION

LYDON, Judge:

This case comes before the court on defendant's motion for summary judgment and plaintiff's opposition thereto. Plaintiff seeks to recover damages which it alleges it incurred when defendant, acting through the Federal Grain Inspection Service (FGIS), Department of Agriculture, breached a contract which plaintiff alleges came into being as a result of an oral agreement between FGIS and plaintiff. In its motion, defendant claims that plaintiff did not have a contract with FGIS, and further challenges the jurisdiction of the court to grant any relief because, first, assuming a contract, no appropriated funds were involved, and second, plaintiff's claim sounds in tort. Further, defendant suggests that the sovereign act doctrine precludes recovery in any event. Plaintiff maintains, in opposition to defendant's motion, that the contract on which it relies, although not embodied in a written agreement, can be inferred from the conduct of personnel of FGIS and plaintiff and that "plaintiff may, upon trial, be able to prove facts in addition to the alleged expressed oral contract, from which a contract [implied in fact] may be inferred by a 'meeting of the minds'."

I.

A. *Background Statement*

In order to place the issues raised by the parties in proper perspective, it is deemed helpful initially to set forth some background information gleaned from the legislative history of the United States Grain Standards Act of 1976, P.L. 94–582, 90 Stat. 2867, 7 U.S.C. §§ 71–87h (1976) which became effective October 21, 1976 (hereinafter the 1976 Act). See H.R.Rep. No. 966, 94th Cong. 2d Sess.; S.Rep. No. 747, 94th Cong.2d Sess. (1976); reprinted [1976] U.S. Code Cong. & Admin.News, pp. 6522–6603.

Initially, there were no federal or state standards for inspection and grading of grain. In time, some states began grain inspection and grading systems. On August 11, 1916, recognizing the need for uniform grain inspection and grading standards, Congress passed the United States Grain Standards Act, 39 Stat. 482.

The 1916 Act provided mandatory national standards and a "two-level" national inspection and grading system for all American grain shipped in interstate or foreign commerce. The first level of this system was operated by state, trade and privately-owned inspection agency employees licensed by the United States Department of Agriculture (USDA). This level was the so-called "official inspection agencies." The second level involved supervisory and appeal inspectors employed by USDA. The Secretary of USDA was permitted to license competent individuals to perform inspection and grading services and to revoke such licenses for cause. The grain industry operated under the 1916 Act until 1968 when the Act was revised. P.L. 90–487, 82 Stat. 761. However, the two-level national inspection and grading system mentioned above remained essentially as it was under the 1916 Act. In substance, this system regulated the performance of what was essentially a government function by state, trade and privately-owned inspection agencies. As of 1976, inspection activities were conducted by individuals who were licensed by the Secretary of Agriculture and who

worked for the various official inspection agencies designated by the Secretary. The role of USDA under the 1916 Act, as amended, was limited to supervision or grading when one party to a sale of grain appealed the decision of a licensed operator. There was no provision in the 1916 Act for the USDA to perform original grain inspections and gradings.

As of 1976, there were about 110 inspection agencies performing grain inspections and gradings in the United States under the 1916 Act, as amended, pursuant to designations by the Secretary of USDA. Of these, 23 were agencies operated by a state, 41 were trade agencies, and 46 were privately-owned agencies. Plaintiff was one of the privately-owned agencies designated by the Department of Agriculture to perform grain inspection and grading services. Plaintiff received its compensation for such services from the sellers of grain.

During 1973 and 1974, reports of irregular practices in the grain inspection system surfaced. Committees of both Houses of Congress undertook their own investigations of this system. These investigations and hearings resulted in the passage of the 1976 Act, *supra*. *See South Louisiana Grain Services, Inc. v. Bergland*, 463 F.Supp. 783 (D.D.C.1978), *aff'd*. 590 F.2d 1204 (D.C.Cir.1978). The 1976 Act federalized the entire grain inspection and weighing system throughout the country. It provided that at export locations, all inspections and weighing work would be performed by federal employees except in those states declared eligible by the Secretary of Agriculture to be delegated authority to undertake these activities. As to inspection and weighing services at inland ports, the 1976 Act required a further study of the system so as to inform Congress of the need to federalize the system at those points. *See* 7 U.S.C. § 79, note.

The 1976 Act authorized and directed the Administrator of the FGIS to cause federalization of grain inspection and weighing "to begin at any time immediately after October 21, 1976, at those export port locations * * * at which the Administrator determines that such performance by such authorized [federal] employees is necessary to effectuate the provisions of [the 1976 Act]." The 1976 Act further provided that any agency, such as plaintiff, who was providing inspection and weighing services on the effective day of the Act may continue to operate without a delegation or designation until "the expiration of a period determined by the Administrator of not more than eighteen months following the effective date hereof." The parties herein agree that this limited period provided by the 1976 Act would run out on April 23, 1978. On this date, or sooner if so determined by the Administrator, all inspection and weighing services at export locations would be performed by federal employees, and not by privately-owned companies such as plaintiff. The sellers of grain would, after federalization, compensate the federal government for performing such services.

B. *The Dispute Between The Parties*

Plaintiff, formerly known as South Louisiana Port Inspection & Weighing Board, Inc., was incorporated in 1963, and was engaged in grain inspection services since that time. Its president and sole director in 1976, John A. Williamson, Jr. (Williamson) was associated with the corporation since its inception. Prior thereto, he had been employed by the Department of Agriculture as a Grain Inspection Supervisor for the period 1949 to 1963. As of 1976, the ownership interests of the corporation were in the hands of five shareholders, which included Williamson.

Plaintiff had been designated, as indicated previously, as an official grain and weighing inspection agency in certain areas in Louisiana. Its central office was in Destrehan, Louisiana. On September 9, 1975, and on numerous occasions prior thereto, plaintiff had written the Department of Agriculture and expressed interest in expanding its grain inspection and weight services to other locations which might become available. In May or June 1976, a location at Port Allen, Louisiana, became available and plaintiff advised the Department of Agriculture it was willing to pro-

vide inspection and weighing services at this location.[1] In March 1976 plaintiff wrote the Department of Agriculture and advised it would like to provide grain inspection and weighing services at the Cargill Grain Elevator that was then under construction in Reserve, Louisiana. In June 1976, plaintiff was designated by the Department of Agriculture to provide these services at the Reserve, Louisiana, location on an interim basis.[2] Subsequently, it would appear, plaintiff was also designated to perform services at this location. As of 1976, plaintiff was authorized to operate inspection services at four export port locations in Louisiana: Ama, Destrehan, Port Allen and Reserve.

In the fall of 1976, Williamson met with a representative of FGIS and was told that, while there was no definite schedule for the federalization of plaintiff's grain inspection and weighing services, plaintiff would be among the last agencies to be taken over in the New Orleans area. Plaintiff received this assurance, Williamson avers, because plaintiff had cooperated with the Department of Agriculture during the difficult period of the grain scandal and because of plaintiff's reputation for integrity. It would appear that plaintiff was, in fact, the last private agency whose inspection services were taken over in the New Orleans area.

On November 24, 1976, plaintiff was advised by FGIS that federal employees would assume its grain inspection and weighing services on July 30, 1977. The concluding paragraph of the November 24, 1976, letter stated:

If, for any reason, there is a need for the Federal Grain Inspection Service to assume inspection activities before the above date, please let us know immediately.

The July 30, 1977, date ostensibly was later changed to August 27, 1977.

By letter dated April 29, 1977, Leslie E. Malone (Malone), Acting Director Inspection Division, FGIS wrote Williamson as follows:

This confirms our telephone conversation of April 29 wherein we mutually agreed to extend until April 23, 1978, the FGIS takeover of the grain inspection and weighing activities which you presently perform.

We appreciate your cooperation in this matter. If for any reason you are unable to continue providing grain inspection and weighing services until April 23, please let us know so we can work out a mutually satisfactory arrangement.

The telephone conversation, confirmed by the April 29 letter set out above, is the genesis of plaintiff's assertion that an oral contract came into being.[3] Williamson avers that in reliance on Malone's assurance

1. The State of Louisiana agency previously supplying services at Port Allen, Louisiana, was suspended for an indefinite period because it was unable to provide the required inspection services to its inspection area, thereby making the location available for assignment to plaintiff. Although aware of the pendency of the legislation which was enacted as the 1976 Act on October 21, 1976, plaintiff was willing to accept this assignment on June 16, 1976, on an interim basis, even though it had to hire 20 more employees and had to purchase $10,000 worth of additional equipment. This assignment initially was for a 90-day period or until the old agency could again provide the required services or until a replacement agency could be designated. Plaintiff, ostensibly, was later so designated.

2. Plaintiff was also willing to accept this interim designation despite the pendency of legislation which was enacted as the 1976 Act on October 21, 1976. The materials at hand do not show how many new employees were hired or how much money was expended on equipment as a result of plaintiff undertaking the Reserve location designation. Parenthetically, two other agencies, along with plaintiff, had applied to the Department of Agriculture for designation as an official inspection agency at the Cargill export grain elevator.

3. John A. Williamson (Williamson) avers that Leslie E. Malone (Malone) informed him that he presently did not have a sufficient number of personnel to staff plaintiff's operations and that he preferred that plaintiff stay on until the end. Williamson avers he specifically asked Malone whether the April 1978 date was firm. Malone, according to Williamson, responded that it was and that the date would be changed only at plaintiff's request.

that the April 1978 date was firm, plaintiff decided to serve as an official inspection agency until April 23, 1978, when by the terms of the 1976 Act, its inspection and weighing services could no longer be provided.[4]

On August 23, 1977, Williamson received a telephone call from David R. Galliart of the FGIS who advised him that FGIS had determined to accelerate the federalization of agency inspection and weighing services in the New Orleans area to December 3, 1977, rather than April 23, 1978. This telephone conversation was confirmed by letter dated August 23, 1977, from David C. Mangum, Acting Administrator FGIS to Williamson. This letter read as follows:

> This confirms the telephone conversation of August 23 with D.R. Galliart wherein he discussed with you the FGIS takeover of your grain inspection and weighing activities on December 3, rather than April 23, 1978, which was earlier agreed to.
>
> In order to carry out the mandates of the Act and to assure equity in the system, we find it necessary to accelerate the takeover process in the New Orleans area. Some grain firms have found it inequitable not to have all FGIS inspection and weighing in the New Orleans area.
>
> We tentatively plan to have representatives from the Personnel, Inspection and Weighing Division visit you and your employees during the week of October 17 to assist your employees in applying for Federal employment and to answer questions. If this week is not satisfactory, please let us know.

Williamson, in response, wrote Dr. Leland E. Bartelt, Administrator, FGIS, on August 26, 1977, as follows:

> We were very disturbed to hear from Mr. Galliart that our scheduled takeover date by FGIS was being changed from April 23, 1978 to December 3, 1977.

It was my understanding from Mr. Malone that April 23, 1978 was a firm date and that no earlier date would be considered unless requested by our Agency. A copy of Mr. Malone's letter confirming our conversation is attached.

In previous conversations with Messers Malone and Cotter I was assured that once a takeover date was established it would not be changed, even if requested by the Trade or other interested parties. However, according to my conversation with Mr. Galliart and the letter I received today from Mr. Mangum (copy attached) this is apparently the main reason for this decision.

After being asked by your Department to extend our services, we consequently geared our operations to an April 23rd takeover, which included purchasing additional supplies and equipment, and hiring extra employees. Curtailment of our operations will definitely create significant financial and personnel problems.

In observing the activities of FGIS employees in the New Orleans area it is obvious that they are not prepared to takeover our operations, which includes four export elevators plus numerous floating rigs. I do not intend to be critical of any individuals. However, I am convinced that an earlier takeover date would create serious problems for FGIS and the industry in our area due to the lack of qualified, experienced personnel. Furthermore, I am confident that a change in the designated takeover would discourage our employees from seeking employment with FGIS, which would further compound the problems of an orderly transition.

Our Agency has worked very diligently, under adverse conditions, to provide efficient service and maintain integrity in the system. We have cooperated completely with FGIS, and feel that this action is grossly unfair and that a great injustice in being perpetrated on all parties involved, including FGIS.

---

4. In doing so, Williamson avers that plaintiff passed up a business opportunity to branch into a new form of business activity, the providing of unofficial inspection services for inland trade, an activity not precluded by the 1976 Act.

Therefore, we respectfully request that you conscientiously review all the facts in this matter and reconsider your decision to change the takeover date of our Agency. An early reply will be appreciated.

Prior to October 21, 1976, and thereafter, plaintiff was an official agency designated to provide official export inspection and weighing services to the St. Charles Grain Elevator and Farmers Elevator in the New Orleans area, which designation was subsequently expanded on June 16, 1976, on an interim basis, to include Port Allen and Reserve, Louisiana. There was no contract between plaintiff and FGIS relative to the operation of providing these inspection and weighing services. Plaintiff's contract relative to these services, as well as compensation therefor, was with, and received from, the sellers of grain. Plaintiff had government approval to engage in this commercial enterprise, but no contractual relationship existed between plaintiff and the government relative thereto.

On December 3, 1977, the FGIS federalized plaintiff's export locations in the New Orleans area. Inland inspection locations were not federalized since they were not covered by the 1976 Act. Thereafter, sellers of grain paid fees to the government for the inspection and weighing services performed by government employee.

Plaintiff subsequently challenged the constitutionality of the basic provisions of the 1976 Act in the United States District Court for the District of Columbia. Plaintiff was unsuccessful in these efforts. *See South Louisiana Grain Services v. Bergland, supra.* Plaintiff filed suit in the United States Court of Claims on June 21, 1981, alleging an oral contract on April 29, 1977, between Malone (FGIS) and Williamson (plaintiff) wherein it was agreed that FGIS would delay until April 23, 1978, the FGIS takeover of plaintiff's inspection and weighing services at export locations in the New Orleans area. When FGIS took over performance of these services on December 3, 1977, plaintiff claims it breached the contract of April 29, 1977.[5]

## II.

### A. *The Question of Jurisdiction*

#### 1. *Non-Appropriated Funds*

Defendant argues that the court cannot award damages to plaintiff because any contract it may be held to have had with FGIS did not involve, obligate or contemplate the use of appropriated funds. Defendant's position is that FGIS is essentially a non-appropriated fund agency since fees

---

**5.** Plaintiff seeks damages of $1,150,000, consisting of (a) lost profits ($500,000); (b) costs of additional supplies and equipment and costs of processing training and hiring extra employees ($150,000); and (c) loss of business reputation and loss of future profits ($500,000). It is clear that plaintiff would not be entitled to recover item (c), *supra,* as damages for breach of contract because such losses are deemed too remote and consequential. *See William Green Construction Co. v. United States,* 201 Ct.Cl. 616, 626–27, 477 F.2d 930, 936–37 (1973). As to item (a), *supra,* the materials presently before the court strongly suggest that any contract deemed to exist between plaintiff and FGIS mandated, by Federal Procurement Regulations, a termination for convenience clause which would preclude any award for anticipated profits on termination of any such contract. *See General Builders Supply Co. v. United States,* 187 Ct.Cl. 477, 485–86, 409 F.2d 246, 251 (1969); *G.C. Casebolt Co. v. United States,* 190 Ct.Cl. 783, 788, 421 F.2d 710, 713 (1970). Plaintiff does not challenge the applicability of the Federal Procurement Regulations to the sit-

uation at hand. Instead plaintiff argues that the use of a termination clause in any FGIS contract was "optional" and not "mandatory." This argument rests on a most narrow and out-of-context reading of the regulations in question. The short answer to plaintiff's argument is that the presence of a termination for convenience clause was mandatory, *see* 41 C.F.R. § 1–8.705–1 (1977), governing contracts for services, but that the short form of the clause could be used, as opposed to the long form, at the agency's option, *see* 71 C.F.R. § 1–8.700–2(A)(2) (1977). Finally, as to item (b), *supra,* it is difficult to appreciate why additional employees, equipment and supplies of the magnitude claimed in item (b) were incurred when plaintiff was not designated to service new locations but would merely have maintained the status quo under its alleged contract until April 23, 1978, when, by statute, its designation as an official inspection agency would have expired. However, this observation is merely food for thought should it be necessary at a later time to face the question of damages.

received from grain sellers would be used to provide for recovery of most of the costs of FGIS operations. Accordingly, defendant concludes, the court lacks jurisdiction to award any damages in this case, assuming the existence of a contract, citing *Kyer v. United States,* 177 Ct.Cl. 747, 751–52, 369 F.2d 714, 718 (1966), *cert. denied,* 387 U.S. 929, 87 S.Ct. 2050, 18 L.Ed.2d 990 (1967); *McCloskey & Co. v. United States,* 208 Ct.Cl. 697, 530 F.2d 374 (1976); and *Novid Co. v. United States,* 210 Ct.Cl. 1, 535 F.2d 5 (1976).[6]

■ It is settled that the jurisdictional grant under the Tucker Act to this court, as it was to its predecessor court, is limited because judgments awarded by this court, and its predecessor, must be paid out of appropriated funds. *Kyer v. United States, supra.* The question for consideration in this case, however, is whether there is a clear expression by Congress that the agency, here the FGIS, in its operations was to be separated completely from general federal revenues. *L'Enfant Plaza Properties, Inc. v. United States,* 229 Ct.Cl. ——, ——, 668 F.2d 1211, 1212 (1982). The court in the *L'Enfant Plaza* case discussed and distinguished the cases cited above, as well as others cited and relied on by defendant.

■ The legislative history of 1976 Act which, *inter alia,* created the FGIS, indicated that it was expected that most of the costs of the federalized inspection programs established by the Act would be recovered through fees collected from grain sellers for program services. There is no question but that Congress wanted FGIS to be as self-supporting and self-sufficient as possible.

However, the provisions of the 1976 Act clearly recognized that appropriated funds would be needed in order for FGIS to function properly and provision was made for authorization of such funds in the 1976 Act for certain purposes. *See* 7 U.S.C. § 87h. For example, section 87h provided in pertinent part for the use of appropriated funds for:

> * * * those Federal administrative and supervisory costs incurred within the Service's Washington office or not directly related to the official inspection or the provision of weighing services for grain; * * * and any other expenses necessary to carry out the provisions of this chapter to the extent that financing is not obtained from the fees and sales of samples as provided for in sections 79, 79a, and 87f-1 of this title.

The above-cited provision is broad enough to remove FGIS from the category of a non-appropriated fund agency and is sufficient to provide a basis for jurisdiction in a contract suit involving FGIS. The decision of the Court of Claims in *L'Enfant Plaza Properties, Inc. v. United States, supra,* clearly supports this holding. *See also McCarthy v. United States,* 229 Ct.Cl. ——, ——, 670 F.2d 996, 1002, wherein the Court of Claims held that if an agency "has authority to use appropriated funds if and to the extent appropriate [and] that is sufficient to avoid the nonappropriated funds exclusion."

Defendant recognizes that the holding in *L'Enfant Plaza Properties, Inc. v. United States, supra,* is not only applicable to the

---

**6.** Defendant also suggests that the decision to federalize plaintiff's inspection services on December 3, 1977, was a sovereign act and thus cannot be considered to be a breach of any contract plaintiff may have had, citing *Wah Chang Corp. v. United States,* 151 Ct.Cl. 41, 50, 282 F.2d 728, 734 (1960) and *Air Terminal Services, Inc. v. United States,* 165 Ct.Cl. 525, 536, 330 F.2d 974, 979–80, *cert. denied,* 379 U.S. 829, 85 S.Ct. 57, 13 L.Ed.2d 38 (1964). The short answer to this suggestion is that in dealing with plaintiff in the circumstances as alleged, as accepted for purposes of ruling on the summary judgment motion, the government was acting primarily in its proprietary capacity and not in its sovereign capacity. Thus the sovereign act doctrine is not applicable in this case. *The Sunswick Corp. v. United States,* 109 Ct.Cl. 772, 796–99, 75 F.Supp. 221 (1948). In this case FGIS's actions were directed specifically at plaintiff's alleged contract performance and were applicable to it. *Compare Anthony P. Miller, Inc. v. United States,* 161 Ct.Cl. 455, 472, *cert. denied,* 375 U.S. 879, 84 S.Ct. 149, 11 L.Ed.2d 111 (1963). Defendant improperly mingles the contractual and sovereign capacities of the government. *See Reynolds Metals Co. v. United States,* 194 Ct.Cl. 309, 318, 438 F.2d 983, 988, *cert. denied,* 404 U.S. 825, 92 S.Ct. 55, 30 L.Ed.2d 54 (1971).

instant situation but also is contrary to defendant's position as advanced in its briefs. Defendant's response to this state of affairs is "that case *[L'Enfant Plaza]* was wrongly decided." The loud and clear answer to defendant's response is that decisions of the Court of Claims are binding precedents in this court unless, and until, they "should be modified, amended or rescinded." United States Claims Court General Order No. 1, adopted October 7, 1982. Accordingly, under the holdings of *L'Enfant Plaza* and *McCarthy*, cited above, the court does have jurisdiction in this case.

### 2. *Tort Claim*

■ As a second string to its jurisdictional bow, defendant chooses to describe plaintiff's claim as one based on the assertion that FGIS interfered with plaintiff's contract with the grain elevators. It is established that such claims are generally considered to be tort claims and not contractual claims. It is well settled that this court, like its predecessor court, has no original jurisdiction over tort claims. *See Williamson v. United States,* 166 Ct.Cl. 239, 244–45 (1964). However, the court must look to the substance of plaintiff's claim rather than to the terminology or characterization used by defendant in determining the nature of plaintiff's claim. *See Somali Development Bank v. United States,* 205 Ct.Cl. 741, 751–52, 508 F.2d 817, 822 (1974).

In its petition, plaintiff bases its claim on a contract it alleges it had with FGIS, which contract, it alleges, defendant breached. There is no allegation in the petition by plaintiff that its claim was based on defendant's interference with service contracts plaintiff had with various grain sellers. In *Williamson v. United States, supra,* cited by defendant in support of its contention that plaintiff's claim sounds in tort, Williamson, an employee of Bendix Aviation Corporation sued the United States claiming that Bendix fired him because personnel of the Department of the Navy wrongfully withheld his security clearance and otherwise interfered with the employed contract he had with Bendix. The Court of Claims deemed this claim to be one sounding in tort. To recite these facts in the *Williamson* case is to distinguish it from this case. Since the claim asserted by plaintiff is clearly contractual as set forth in the petition and as pursued substantively and procedurally, there is no basis in law, fact or language characterization for viewing the claim as one sounding in tort. *See Chain Belt Co. v. United States,* 127 Ct.Cl. 38, 54–55, 115 F.Supp. 701 (1953). The court does have jurisdiction of plaintiff's alleged contractual claim.

### B. *Was There a Contract?*

In its motion for summary judgment, which was supported by affidavits and other documentary materials, defendant contends that plaintiff did not have a contract with FGIS simply because FGIS was not authorized to contract with plaintiff nor did it intend to contract with plaintiff. Defendant maintains that the agreement reached between plaintiff and FGIS on April 29, 1977, was merely a reaffirmation that plaintiff was authorized or designated to continue to perform inspection services until April 23, 1978, when inspection services performed by plaintiff would be federalized. However, defendant stresses, such an authorization did not serve to abrogate the discretion reposed in the Administrator of FGIS by the 1976 Act to schedule federalization of inspection services in plaintiff's case whenever the Administrator determined that such action was necessary to effectuate the provisions and purpose of said Act. Defendant views plaintiff's authorization, both before and after April 29, 1977, from FGIS as more in the nature of a license or permit to continue to perform inspection services rather than a contract to do so, citing *United States v. Smith,* 39 F.2d 851 (1st Cir.1930) and *Palmetto Fire Insurance Co. v. BEHA,* 13 F.2d 500 (D.C.N.Y. 1925).

Plaintiff, in its opposition to defendant's motion, likewise supported by an affidavit and other documentary materials, maintains that in order to ensure that plaintiff continued to perform inspection services during the hectic and chaotic period subsequent to passage of the 1976 Act, FGIS

agreed (contracted) orally with plaintiff to have plaintiff continue providing services until April 23, 1978. Plaintiff alleges that FGIS advised it did not have the manpower to federalize or takeover plaintiff's inspection services at the time of the agreement on April 29, 1977, and infers that FGIS wanted to lock plaintiff into performing the inspection services until the very last moment so as to cover the possibility its manpower takeover problem might continue for some time beyond April 29, 1977. Thus, plaintiff suggests the agreement had mutual considerations; *i.e.,* plaintiff would be ensured of performing services until April 23, 1978, and FGIS would be ensured plaintiff would not decline to perform services prior to that date and leave FGIS without the manpower to fill this void.

It is clear from the materials at hand that the 1976 Act conferred discretion on the Administrator of FGIS relative to the schedule of converting from private agency inspection to federalized inspection. Absent the "agreement," so labeled in defendant's letters of April 29, 1977 and August 23, 1977, there is no doubt but that plaintiff's services could have been federalized at any time after the effective date of the 1976 Act, which was enacted on October 21, 1976, in the discretion of the Administrator of FGIS. The alleged agreement of April 23, 1977, however, does seem to raise some questions about whether the Administrator, in the exercise of his discretion, might have concluded that a contract with plaintiff was, at the time, the best way to provide for continuous grain inspection services, thereby effectuating the provisions and purposes of the 1976 Act, and thus was "authorized" by the 1976 Act, and so intended to enter into such an agreement. It is stressed, however, that the above observations consist of inferences one might draw from the materials at hand.

If this matter were before the court on the merits, with the same record that is presently before the court, one would be hard pressed to find the existence of a binding contract. The concluding paragraph of the April 29, 1977, letter confirming the telephone conversation between Malone and Williamson which gave birth to the alleged oral agreement, suggests rather strongly that plaintiff was not bound to provide services until April 23, 1978, thereby negating any view that a binding contract had been intended or consummated. However, the posture of this case now is different and, as such, it precludes, under accepted legal standards, the granting of defendant's motion for summary judgment.

■ To grant defendant's motion for summary judgment there must be no genuine issue as to any material fact. *Technograph Printed Circuits, Ltd. v. United States,* 178 Ct.Cl. 543, 560, 372 F.2d 969, 980 (1967). Further, all doubts relative to material facts in issue must, for purposes of ruling on the summary judgment motion, be resolved against defendant as the moving party. *Housing Corp. of America v. United States,* 199 Ct.Cl. 705, 710, 468 F.2d 922, 924 (1972). When the materials presented to the court present a choice of inferences to be drawn from the underlying facts, which is the situation at hand, the inferences must be viewed in the light most favorable to plaintiff, the party opposing the motion. *Coastal Petroleum Co. v. United States,* 220 Ct.Cl. 690, 693 (1979).

■ In this case, based on the submissions of the parties, there are genuine issues of fact relating to the nature and scope of the oral agreement in issue, the intent of the parties relative thereto, whether there was in fact a "meeting of the minds" of the parties sufficient to create a binding and enforceable agreement, and whether Malone, or any official of FGIS had authority to contract with plaintiff, as alleged by plaintiff. In *Narva Harris Construction Corp. v. United States,* 216 Ct.Cl. 238, 243–45, 574 F.2d 508, 511–12 (1978) the Court of Claims denied a motion for summary judgment filed by defendant based on the assertion that no contract existed between the parties because the alleged contract had its genesis in oral commitments the contractor had with personnel of the Department of

Housing and Urban Development.[7] In denying defendant's motion in the *Narva* case, the court made the following statement which is strikingly applicable to the case at bar:

> It appears from the record now before us—which must be interpreted in a light most favorable to the plaintiff for purposes of withstanding defendant's motion for summary judgment—that plaintiff may be able to prove facts, in addition to the alleged express oral contract, from which a contract may be inferred. * * * [216 Ct.Cl. at 245, 574 F.2d at 512.]

### III.

IT IS THEREFORE ORDERED, on careful consideration of the briefs and supporting materials of the parties, that defendant's motion for summary judgment is denied since there exists genuine issues of material fact which must be ventilated by a trial. A pretrial order is being issued contemporaneously with the filing of this opinion so as to move this case forward to trial.

---

**7.** Defendant does not argue 31 U.S.C. § 200 (1976), although it pleaded this provision as an affirmative defense in its answer, as a basis for denial of plaintiff's oral agreement claim, presumably because a like argument was rejected by the Court of Claims in *Narva Harris Construction Corp. v. United States,* 216 Ct.Cl. 238, 574 F.2d 508 (1978).