**McDONALD'S CORPORATION,**
Plaintiff–Appellant,

v.

**The UNITED STATES,**
Defendant–Appellee.

No. 90–5117.

United States Court of Appeals,
Federal Circuit.

Feb. 20, 1991.

Stephen N. Shulman, Cadwalader, Wickersham & Taft, Washington, D.C., argued for plaintiff-appellant. With him on the brief was Joel Kaufman.

Jeanne E. Davidson, Atty., Commercial Litigation Branch, Dept. of Justice, Washington, D.C., argued for defendant-appellee. With her on the brief were Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director and Velta A. Melnbrencis.

Before RICH, PLAGER and CLEVENGER, Circuit Judges.

CLEVENGER, Circuit Judge.

McDonald's Corporation ("McDonald") appeals the judgment of the United States Claims Court dismissing its suit for breach of contract against the United States ("Government") for lack of jurisdiction under the doctrine of sovereign immunity. *McDonald's Corp. v. United States*, No.

746–88C, slip op. (Apr. 27, 1990) (*"McDonald"*). The Claims Court held that a 1970 amendment to the Tucker Act that waived sovereign immunity for certain non-appropriated fund instrumentalities ("NAFIs") of the United States had not included the Navy Resale and Services Support Office ("NAVRESSO") with which McDonald had contracted. *See* Nonappropriated Fund Activities Act, Pub.L. No. 91–350, 84 Stat. 449 (1970) (codified at 28 U.S.C. § 1491(a)(1) (1988)). Since we conclude to the contrary, we reverse.

I

In 1984, the Defense Department decided to fulfill "a strong demand by military families for the products of the leading national fast-food chains" by soliciting bids from those organizations to provide facilities on U.S. military bases throughout the world. Letter from Secretary of Defense Weinberger to Sen. Randolph (July 30, 1984) (cited in *Randolph–Sheppard Vendors v. Weinberger*, 795 F.2d 90, 95 (D.C.Cir. 1986)); *see also McDonald* at 1. The proposals were to be returned to either the Army and Air Force Exchange Service ("AAFES"), a unified organization that provides post exchange-type services at Army and Air Force bases, or NAVRESSO. *Randolph–Sheppard* at 94–95. McDonald bid on and was awarded a contract by NAVRESSO. McDonald's contract called for it to construct and operate between 40 and 300 fast-food facilities. *Id.; McDonald* at 1. After McDonald began operation of a facility at the Navy Exchange in Naples, Italy, a controversy over beef supplies resulted in McDonald discontinuing operations based upon the assertion of Government breach of contract. *McDonald* at 1–2. McDonald then filed suit in the Claims Court against the United States seeking contract damages from the alleged breach of contract.

II

NAVRESSO occupies a small office in Staten Island, New York, that styles itself the "central management office" for the Navy resale system. Guide for Doing Business with ... The NAVY RESALE SYSTEM, Pub. No. 44, U.S. Navy (July 1988) (ellipsis original) ("DB NAVRESSO"). Unlike the unified AAFES, the Navy resale system generally delegates purchasing to independent local Exchanges. In the 1970s, in order to obtain volume discounts, the Navy established seven regional Field Support Offices ("FSOs") which "provide direct support to resale system activities in designated geographic areas" by negotiating regional contracts on behalf of the local Exchanges. DB NAVRESSO at 3, 7–8; *see also Navy Resale System News Digest* at 6 (April, 1976) (described as "[r]ecent innovations"). Finally, the Navy has assigned to NAVRESSO the duty to negotiate system-wide contracts for the resale system, much like a "corporate headquarters." NAVRESSO is staffed by military personnel and is supervised, pursuant to an organizational chart, by the Commander of the Naval Supply Systems who is, in turn, under the Chief of Naval Material. Ultimately, the entire operation is under the command of the Chief of Naval Operations. *Review of the Military Exchanges and Commissaries and Related Activities in Report by the Special Subcomm. on Exchanges and Commissaries of the House Comm. on the Armed Services*, 91st Cong., 2nd Sess. 12359 (1970) (*"Armed Services Report"*).

NAVRESSO's supervisory duties over the resale system are described in the Government's brief:

NAVRESSO negotiates listings, known as Price Agreement Bulletins, and systemwide contracts.... A Price Agreement Bulletin provides information concerning prices and products.... [I]ndividual Navy Exchanges may place orders directly with the manufacturer for products listed in the bulletins. Systemwide contracts are generally negotiated upon a competitive basis among manufacturers and suppliers of products commonly used by all Navy Exchanges.

Although the products purchased are ultimately sold by a local Exchange, "[s]uppliers may do business with the FSOs,

NAVRESSO or the independent resale activities." DB NAVRESSO at 5. NAVRESSO "has a staff of buyers and contract specialists who review merchandise lines and determine if a product or service could be made available to [its] authorized customers. Generally, the buyers and contract specialists negotiate with manufacturers and suppliers to ascertain terms, prices, minimum quantities, packaging and other information about a product or service in order to assist field personnel in making purchase determinations." *Id.*

### III

NAVRESSO's duties extend beyond supervision of the Navy Exchanges. In 1950, shortly after NAVRESSO's establishment under the name, Navy Ship's Store Office, its mission was summarized as "management control over Ship's Stores Ashore, Commissary Stores, Navy Exchanges and MSTS Exchanges," *McDonald* at 3, and "Technical Control over Ship's Stores afloat." Letter from G. Bauernschmidt to Unidentified Distribution List cited in Memorandum of A. Antrim entitled Navy Ship's Store Office Order No. (A)–19 (Feb. 20, 1950). This mission survives, but many of the organizations listed, including NAVRESSO itself, have undergone name changes or structural reorganizations. For instance, in 1950, the Ship's Stores Ashore were folded into the Commissary Stores. Subsequently, the MSTS Exchanges have been renamed the Military Sealift Command ("MSC") Exchanges. In 1969, the Navy changed the name of the supervisory office to the Navy Resale Systems Office, or NAVRESO. In sum, at the time of the 1970 amendments to the Tucker Act, NAVRESO exercised "command" over the Commissaries and "technical support & admin[istrative control]" over the Ship's Stores Afloat, the Navy Exchanges, and the MSTS Exchanges. *Armed Services Report* at 12391.

In 1970, the Commissaries and the Ships Stores Afloat operated as "appropriated fund programs," and were not, therefore, legally NAFIs. *Id.* at 12359. In sum, the only components of the Navy's resale system which were exclusively funded by non-appropriated funds were the two categories of "Exchanges." NAVRESSO itself was manned by personnel on the Navy's payroll, and thus funded by appropriated funds. For instance, the individuals with whom McDonald actually negotiated the instant agreement were officers of the Navy whose salaries presumably are limited to appropriated funds. Apparently, in 1970, NAVRESSO also used some non-appropriated funds for its own operations, as confirmed by the *Armed Services Report* which notes that "approximately 9% of the [resale system's] total corporate costs in the New York office is financed from nonappropriated funds[, a]lthough it was admitted that these expenses should come from appropriated funds...." *Armed Services Report* at 12359. NAVRESSO has always been authorized to enter into contracts which obligate non-appropriated funds, although the Government concedes that "NAVRESSO [also] may enter into contracts on behalf o[f] the Navy Commissaries with appropriated funds...." *See also* Enclosure attached to Letter from R.E. Curtis, Commander, U.S. Navy, to various supervisory U.S. Navy Personnel (Jan. 11, 1982) at 3, § 2(u) ("administer funds authorized under the appropriated Operation and Maintenance, Navy (O & M, N) for the operation of commissary stores"). In sum, only NAVRESSO, acting on its own or at the direction of an entity in the organizational chart above NAVRESSO, may expend funds commingled from both appropriated and non-appropriated sources, making them, at least in part, NAFIs.

NAVRESO was renamed NAVRESSO in 1979. Currently, NAVRESSO is responsible for the Navy Exchanges, Ship's Stores Afloat, Commissary Stores, and the MSC Exchanges. Ship's Stores Afloat and MSC Exchanges are small, limited-service retail stores located on naval vessels; Commissaries resemble commercial supermarkets. DB NAVRESSO at 9–10.

### IV

Congress waived sovereign immunity for some contract claims against the Govern-

ment under the Tucker Act. 28 U.S.C. § 1491 (1988). In 1970, Congress expanded that waiver, so that § 1491(a)(1) now reads, in pertinent part:

> For the purpose of this paragraph, an express or implied contract with the Army and Air Force Exchange Service, Navy Exchanges, Marine Corps Exchanges, Coast Guard Exchanges, or Exchange Councils of the National Aeronautics and Space Administration shall be considered an express or implied contract with the United States.

The Government contended below, and reiterates its argument here, "that Congress intended to waive sovereign immunity for claims against only the NAFIs enumerated in the statute." The Claims Court agreed, stating:

> When 28 U.S.C. § 1491 was amended in 1970 to provide jurisdiction over contract claims against listed nonappropriated fund instrumentalities, the language did not include the Naval Resale System Office, then in existence, apart from "Navy Exchanges." The express limitation of 28 U.S.C. § 1491 jurisdiction to "Navy Exchange" contract claims cannot appropriately be judicially amended to include claims against a separate nonappropriated fund entity, NAVRESSO.... If Congress intended to provide Tucker Act jurisdiction over NAVRESSO contracts, it would have included this entity in the listing much as it did for the comparable Army and Air Force organization, the "Army and Air Force Exchange Service." 28 U.S.C. § 1491(a); *see also* 5 U.S.C. § 2105(c) (Congress included "Navy Ship's Stores Ashore" together with "Navy Exchanges").

*McDonald* at 3–4.

McDonald contends either that NAVRESSO is included within the statutory term "Navy Exchanges" when the contract in question benefits the Navy Exchanges, or that NAVRESSO is included in the waiver when acting on behalf of the Navy Exchanges as when it negotiated this contract. We must therefore decide whether Congress, in 1970, meant to waive sovereign immunity for contract disputes origi-

nating from contracts negotiated and signed by NAVRESSO when NAVRESSO enters into a commercial contract for the supply of goods or services at a Navy Exchange.

## V

The Tucker Act waived sovereign immunity for contract actions taken with appropriated funds. For instance, many activities taken by NAVRESSO, or the contractual activities of the Commissaries or Ship's Stores, had been susceptible to adjudication under the Tucker Act, because they obligated appropriated funds. However, before the 1970 amendment, there was no waiver of sovereign immunity for NAFIs because, to overcome that immunity, the "contract must be one which, in the contemplation of Congress, could obligate public monies." *Kyer v. United States*, 369 F.2d 714, 718, 177 Ct.Cl. 747 (1966), *cert. denied*, 387 U.S. 929, 87 S.Ct. 2050, 18 L.Ed.2d 990 (1967). During the 91st Congress, Senator Tydings introduced a bill designed to correct the "injustice and inequity worked by this Tucker Act 'loophole'...." S.Rep. No. 268, 91st Cong., 1st Sess. 2 (1969). The original version of S. 980 provided for a waiver for all implied or express contracts with all NAFIs, with the limitation that if the NAFI were not financially able to pay a judgment, then funding for that judgment would come from the general treasury. For the purpose of clarification, a Commissioner of the Court of Claims described NAFIs generically during testimony:

> Their birth is funded by the Government. The seed money for their creation came from the Government. They are managed by Government people who are paid Government salaries. They usually occupy Government facilities, perhaps on some cost-reimbursable arrangement, but on Government real estate, using Government facilities.
>
> They perform essentially a morale-building function for the Government personnel, which the Government would otherwise have to appropriate funds for if it weren't having it done in this man-

ner [by funding through direct sales to or service fees from the personnel benefitted]. There is a very close identity between them and the Government people with whom they are working every day. They are providing service to Government people engaged in a Government mission.

Testimony of Louis Spector, Commissioner of the Court of Claims, *Jurisdiction of U.S. Courts—Nonappropriated Fund Activities: Hearings on S. 980 Before Subcomm. No. 4 of the House Comm. on the Judiciary*, 91st Cong., 1st Sess. 9 (1969) (*"Judiciary Hearings"*).

The original language of S. 980 provided that "an express or implied contract with a nonappropriated fund activity of or under the United States or a department or agency of the United States shall be considered an express or implied contract with the United States." S. 980, 91st Cong., 1st Sess. ¶ 1 (1969). Generally, the bill was supported by the Defense Department which advised the Senate that "[t]here appear to be no policy grounds justifying nonappropriated fund instrumentalities in continuing to claim absolute immunity from suits on their contracts when Congress has waived such immunity in suits on contracts with the Federal Government itself." Letter from Thomas Nielson to Hon. James Eastland (May 20, 1968), *reprinted in* S.Rep. No. 91–268, 91st Cong. 1st Sess. 8 (1969). The Defense Department expressed confidence that the scope of the bill would not be interpreted to cover "employees' associations organized by employees for their own benefit and chartered pursuant to the local laws," but recommended amendment of the bill to clarify that issue by inserting language limiting the waiver to NAFIs "established and operated under regulations prescribed by the head of the department or agency concerned." *Id.* at 9.

The Senate passed S. 980 without the suggested amendments. 115 *Cong.Rec.* S7305 (1969). Upon delivery to the House, S. 980 was referred to Subcommittee No. 4 of the Judiciary Committee. During hearings before the Subcommittee, the Department of Defense reiterated its objection that a broad waiver of NAFI immunity would obligate funds of the United States for behavior that was beyond the supervision and control of the department or agency concerned. The Department of Agriculture made the same objection in a letter to the Committee which stated:

We believe that the bill was primarily designed to cover these peripheral military institutions, such as officers' clubs, post exchanges and ships' stores, which are considered by the courts to be instrumentalities of the United States and yet are not supported by appropriated funds.

\* \* \* \* \* \*

We are, however, concerned that the bill may exten[d] liability to contracts o[r] activities which this Department cannot supervise or control, such as informal associations of employees for recreational purposes. It is our view that the United States should not be liable under the Tucker Act for the activities of a group which is not subject to procurement control by the proper officials of this Department.

Attachment to Letter from Secretary Hardin, Dep't of Agriculture, to Hon. Emanuel Celler (Sept. 24, 1969), *reprinted in* H.Rep. No. 91–933, 91st Cong., 2nd Sess. 7 (1970), U.S.Code Cong. & Admin.News 1970, pp. 3477, 3483.

At the hearing before the Subcommittee, Air Force Lieutenant Colonel Rosker, from the Office of the Judge Advocate General, and Mr. Wiggins, a Representative, engaged in colloquy directed at the concern that S. 980, in solving the problem of immunity for all NAFIs, would extend Government liability to any small, impecunious, or informally-organized group of servicemen not under the supervision and control of the department or agency:

WIGGINS: I am worried about the definition of "nonappropriated funds." Every time I think of one, you give me another one; then I think of another possibility. But let's suppose we took all the guesswork out of the matter and said we are going to solve the problem of the

PX's for all branches of the armed services.

How much of the problem are we solving if we do that?

Colonel ROSKER: If I understand you correctly, I think you are suggesting that there be a limitation on suits only against the PX's.

WIGGINS: I am just throwing that out now as a way of avoiding the possibility of [an] open-end[ed] definition.

Colonel ROSKER: Naturally from a dollar standpoint, the PX's spend a massive percent of the dollars involved as far as expenditures of nonappropriated funds. But I think that the whole concept is that each and every one of these funds really serve just as much a governmental purpose as the other.

WIGGINS: I understand what you are saying, but that assumes we can identify the funds we are talking about. But with this very vague definition, we may not be able to do that.

Testimony of Lieutenant Colonel Rosker, Office of Judge Advocate General, *Judiciary Hearings* at 18–19.

At the mark-up meeting of the Judiciary Committee of the House of Representatives, Mr. Rogers, Chairman of Subcommittee No. 4, reported favorably on S. 980, but recommended the adoption of an amendment which limited the scope of the waiver to that found in the current statute. Minutes of Meeting No. 21, House Committee on the Judiciary, 91st Cong., 2nd Sess. 8 (March 10, 1970).

Finally, during debate on the House floor, after committee adoption of the suggested amendment, Mr. Hall requested assurances of Mr. Rogers that the Senate would accede to the House amendments limiting the waiver of immunity to "the commissaries and post exchanges of the military services." 116 *Cong.Rec.* H2681 (April 7, 1970). Mr. Rogers replied that the House intended the "bill to apply to the Army and Air Force exchange services, Navy exchanges, the Marine Corps exchanges, the Coast Guard exchanges, and the exchange councils of the National Aeronautics and Space Administration. It was our view that all of that group are solvent and that such action should only be instituted against that group and no other." *Id.* The Senate agreed to the House amendments. 116 *Cong.Rec.* S 11272 (July 14, 1970).

## VI

The Government invites us to find that the plain words of the statute, enumerating multiple Defense Department organizations, make the meaning patently obvious without resort to the legislative history and exclude from the statutory waiver any Navy organization, such as NAVRESSO, that is not specifically named, regardless of its function. There is appeal in the Government's simple approach to the statute, but we resist this temptation because the list describes a particular but broad category of organizations by function. Additionally, the Navy's persistent renaming and reorganizing of the entities in its resale system, both before and after 1970, encourages us to examine the legislators' understanding of the character of the activities conducted by the organizations enumerated. For instance, we cannot read the statute as limited to the "specified five, and only five, NAFIs in the 1970 Amendments," as the Government argues because, as the Government must admit, there are far more than five entities within the "Navy Exchanges" category alone which includes at least 300 entities, each called a Navy Exchange. Furthermore, the MSC Exchanges, although carrying names distinguishable from other entities specifically called Navy Exchanges, are nevertheless Exchanges and within the Navy.

Under the Government's view of the statute, the Navy could eliminate its NAFI liability completely by simply reorganizing its purchasing to coincide with the AAFES system. Under that scenario, in which NAVRESSO would conduct all the commercial purchasing for subservient Navy Exchanges, the Congressional purpose would be completely frustrated. In order to avoid that clearly unintended result, Congress would be required to amend the statute with regularity as the Navy, or another

Armed Service, changes the name of an organization, reassigns duties to a different entity, or restructures the various functions involved in the resale system, as the Navy has historically done.

Furthermore, the Government's argument proves too much. Any organization not explicitly named, and which obligated any insubstantial amount of non-appropriated funding, would retain an immunity that Congress found to be a loophole in need of closing, thereby creating a new, although smaller, loophole in a bulwark Congress concluded should be solid.

Finally, the Government's sense of the statute is brought into doubt by the contract in this case which involves third-party beneficiaries, the Navy Exchanges, which are expressly named in the statute. The Government cannot deny that this contract supplied no benefit to NAVRESSO itself, or to the U.S. Navy in general, being designed to benefit paying servicemen seeking fast food at the various Exchanges.

A more sensible reading of the comprehensive and categorical listing in the statute is that found in the legislative history, where Congress indicated its intention to limit the waiver of sovereign immunity to a specific category of military organizations funded by resale activities which rendered them solvent and therefore able to support an adverse judgment without risk to the general treasury. The House Report lays out a three-part functional test that it applied in developing the category of organizations:

> First, since not every nonappropriated fund activity has sufficient assets to reimburse the United States, the cost of the judgment would in some cases be imposed on the taxpayer—a result which is inconsistent with the very concept of nonappropriated fund activities.
>
> Second, the broad inclusion of all nonappropriated fund activities might create serious definitional questions, making it difficult to predict the outer limits of the liability of the Federal Government.
>
> Third, data concerning all of the nonappropriated fund activities of the

United States is unavailable. The Bureau of the Budget has not compiled such data nor can such data be obtained from the various Government agencies under which nonappropriated fund activities are conducted.

H.Rep. No. 91–933, 91st Cong., 2nd Sess. 3 (1970), U.S.Code Cong. & Admin.News 1970, p. 3479.

Under this three-part test, we must conclude that a NAFI which lacks sufficient assets, is not clearly defined as being within the resale system, or over which the Government could not obtain financial data, would not be included in the statutory waiver. For instance, the FSOs might be considered within the enumerated category, *Union Oil Co.*, 86–1 BCA (CCH) ¶ 18,605 (A.S.B.C.A. Nov. 21, 1985), but an organization serving the recreational needs of servicemen might not. *Wolverine Supply, Inc. v. United States*, 17 Cl.Ct. 190 (1989).

Mr. Wiggins suggested that the waiver be limited to suits against "the PX's for all branches of the armed services" and Congress apparently agreed. *Judiciary Hearings* at 18. The Senate Report states that this was because "[t]he Armed Forces post exchange system—a prime example of a nonappropriated fund activity—is now the third largest department store chain with annual sales of over $3.5 billion exceeded only by Sears, Roebuck & Co. and J.C. Penney Co." S.Rep. No. 259, 91st Cong., 1st Sess. 3 (1969). Colonel Rosker stated that the PX's "have turned over a considerable amount of money to the General Treasury over the years, and I think in an amount that would exceed $40 or $50 million at least." *Judiciary Hearings* at 22. We read the language of the amendment to enable us to look to a category of military organizations whose nature, character and purpose are indicated by the activities actually performed, rather than to the particular rubric under which a service may have currently chosen to denominate the activity. The legislative history repeatedly describes the implicated activity as "post ex-

change types of operations." * Seldom has the intent of Congress and the test for satisfying that intent been so clear. Congress selected the specific terms to avoid an open-ended definition that might be construed to cover non-supervised and non-controlled military organizations, heedless, perhaps, that the Government might later urge that a comprehensive definition by categorical enumeration risked excluding the very system-wide commercial PX contracts most likely to represent a solvent non-appropriated enterprise.

The legislative history recited above also indicates that the waiver of sovereign immunity was to be applied to supervisory organizations such as NAVRESSO. We cannot hold that Congress enacted a waiver for a subsidiary organization because it was historically solvent and under the supervision and control of the Defense Department, and yet failed to waive immunity for the very agency which exercises the supervision and control, and has access to the funds in question. Therefore, we conclude that NAVRESSO, when contractually obligating non-appropriated funds derived from resale activities in its Exchanges, is not immune from suit. We do not believe that the Government can successfully cavil that the activity for which NAVRESSO contracted, supplying fast food to servicemen at between 40 and 300 PX's around the globe, falls within the ambit of "a post exchange type of operation." We therefore reverse the dismissal for lack of jurisdiction and remand for consideration of the merits.

REVERSED and REMANDED.

---

* S.Rep. No. 259, 91st Cong., 1st Sess. 2 (1969) ("The Defense Department, parent of the greatest number of these activities (military post exchanges, ships stores, etc.) has agreed...."); Statement of Sen. Tydings, *Judiciary Hearings* at 2 ("most familiar are the military post exchange and the ship's store"); Statement of Commissioner Spector, *Judiciary Hearings* at 8 ("This bill seems to be designed to say [that if] the PX is the principal, that it is the United States"); Statement of Colonel Rosker, *Judiciary Hearings* at 22 ("the bulk [of the] problem, it would be in ships stores and PX"); H.Rep. No. 91–933, 92nd Cong., 2nd Sess. at 3 (1970), U.S.Code Cong. & Admin.News 1970, p. 3479 ("sovereign immunity of the United States would be removed only with respect to the post exchange types of operations which are conducted within the Defense Department"); Attachment to Letter of Secretary Hardin, *reprinted in* H.Rep. No. 91–933, 91st Cong., 2nd Sess. 7 (1970), U.S.Code Cong. & Admin.News 1970, p. 3482 ("the bill was primarily designed to cover these peripheral military institutions, such as officers' clubs, post exchanges and ships' stores"); Letter of Spencer Schedler, Assistant Secretary of the Air Force, to Hon. Emanuel Celler (Sept. 24, 1969) *reprinted in* H.Rep. No. 91–933, 91st Cong., 2nd Sess. 12 (1970), U.S.Code Cong. & Admin.News 1970, p. 3487 ("military exchanges"); Statement of Mr. Hall, on the floor of the House of Representatives, 116 *Cong.Rec.* H2681 (April 7, 1970) ("the commissaries and post exchanges of the military services"); Statement of Mr. Rogers, *id.* ("the bill applies only to post-exchange types of operations—all of which have sufficient assets to pay their own way—we would not be drawing on tax funds"); Statement of Mr. Fish, *id.* at H2682 ("We made S. 980 applicable only to the post exchanges of the military services and NASA"); Statement of Mr. Tydings, on the Senate floor upon final passage, 116 *Cong.Rec.* S11272 (July 14, 1970) ("As amended by the House of Representatives, S. 980 would provide for the waiver of sovereign immunity of the United States only with respect to post-exchange type of operations which are conducted within the Defense Department and the National Aeronautics and Space Administration").