## McCLOSKEY & COMPANY

v.

## The UNITED STATES.

### No. 406–74.

United States Court of Claims.

Jan. 28, 1976.

14. Pltf's Brief, p. 9.     15. *Id.*

Gilbert A. Cuneo, Washington, D.C., attorney of record, for plaintiff; Thomas L. Patten, Sellers, Conner & Cuneo, Washington, D.C., of counsel.

David R. Schlee, Washington, D.C., with whom was Asst. Atty. Gen. Rex E. Lee, Washington, D.C., for defendant.

Before DURFEE, Senior Judge, and NICHOLS and KASHIWA, Judges.

DURFEE, Senior Judge:

█ Plaintiff's present contract claims arise from its construction of the District of Columbia (now Robert F. Kennedy) Stadium. In 1960, plaintiff contracted with the District of Columbia Armory Board (Board) for the construction of a stadium facility in the District of Columbia. The Armory Board's contracting officer accepted the stadium as complete on April 9, 1962. Following completion of the stadium, plaintiff filed various contract claims with the contracting officer. The contracting officer denied all of plaintiff's claims.

Thereafter, plaintiff appealed the contracting officer's denial of its claims to the District of Columbia Contract Appeals Board, the forum designated in the parties' contract to hear such claims. That Board denied plaintiff's claims entirely. Plaintiff subsequently petitioned this court under our general jurisdiction statute (28 U.S.C. § 1491) for review of the District of Columbia Contract Appeals Board decision under the standards of the Wunderlich Act (41 U.S.C. §§ 321, 322). Defendant responded to plaintiff's petition with a Rule 38(b) motion to dismiss for lack of court jurisdiction. Defendant's motion is granted.

The court's general jurisdictional statute, 28 U.S.C. § 1491, restricts our jurisdiction to claims against the United States founded upon an express or implied contract with the United States.

In order to present an actionable contract claim cognizable within this jurisdiction the contract sued upon must be one which can be satisfied out of appropriated funds. *Manning v. United States*, 200 Ct.Cl. 756 (1973). This is because, as we explained in *Kyer v. United States*, 369 F.2d 714, 717–18, 177 Ct.Cl. 747, 751–52 (1966), *cert. denied*, 387 U.S. 929, 87 S.Ct. 2050, 18 L.Ed.2d 990 (1967):

The jurisdiction of this court under the Tucker Act encompasses "any claim against the United States: * * * founded * * * upon any express or implied contract with the United States; * * *." While the terms of this statute are broad, its words must be read in conjunction with and must be regarded as limited by another statute which provides that our judgments are paid only from appropriated funds. Thus, to remain within the framework of our jurisdiction, it is essential that the contract sued on be one which could have been satisfied out of appropriated funds. It is not enough to say, as plaintiff does, that his contract was one to which the United States was a

party. To be actionable *in this court,* that contract must be one which, in the contemplation of Congress, could obligate public monies. *G. L. Christian & Associates v. United States,* 312 F.2d 418, 425, 160 Ct.Cl. 1, 14, *cert. denied,* 375 U.S. 954, 84 S.Ct. 444, 11 L.Ed.2d 314 (1963). If Congress has indicated that public funds shall not be involved, we cannot grant the relief requested. \* \* \*1

In the instant case, the United States was neither directly a party to the underlying contract nor, more importantly, were appropriated public funds involved.

Congress created the District of Columbia Armory Board in 1948 " \* \* \* to provide facilities for the quartering and training of the Militia of the District of Columbia, and, secondarily, to provide suitable facilities for major athletic events, conventions, concerts, and such other activities as may be in the interest of the District of Columbia \* \* \* ." 2 D.C. Code § 1701.2

At the time of its creation, Congress provided the Board with a permanent revolving working capital fund to cover the Board's expenses in the exercise of its initial responsibilities. Congress later expanded the Board's use of this fund to include its office and sundry expenses, and for change-making purposes in connection with the Board's operation of the stadium. 2 D.C. Code § 1708.

In 1957 Congress authorized the Board to contract for construction of a stadium facility in the District of Columbia. 2 D.C. Code § 1720. Congress directed that "the cost of planning, designing and constructing such stadium" should come not from an appropriation of public funds but rather from the Board's issuance of bonds. 2 D.C. Code § 1722. The Congressional-authorizing legislation placed several restrictions on the Board's bond-issuing authority including the condition that the issuance of the bonds "shall be so calculated as to produce, at the price of their sale, the cost of the stadium constructed pursuant to this subchapter." 2 D.C. Code § 1722.

Under the Congressionally-enacted stadium financing scheme all proceeds from the Board's bond sales were to be placed in an operating fund and that fund utilized for *all* the costs of stadium construction. 2 D.C. Code § 1724. In addition to the operating fund for payment of stadium construction costs, Congress authorized the creation of a sinking fund for retirement of the Board's principal and interest obligations on its bond issues. Into this fund were to be placed the excess of the operating fund, if any, after the payment of construction and other specified stadium expenses and all stadium operating revenues. In the event that the amount in the sinking fund was insufficient to meet the Board's bond obligations, Congress authorized the Board, acting through the Commissioners of the District of Columbia, to request sufficient amounts out of the revenues of the District of Columbia, or borrow the necessary funds from the Secretary of the Treasury from specified funds held by the Secretary. Board loans from the Secretary of the Treasury were to be repaid promptly with interest. 2 D.C. Code § 1727.

Incident to the Board's authorization to construct the stadium Congress directed the Secretary of the Interior to acquire and prepare a designated site for construction of the stadium. 2 D.C. Code § 1721. In addition, Congress provided that all bonds issued by the Board would be guaranteed as to both principal and interest by the United States. 2 D.C. Code § 1727. Further, Congress required the Board to make annual financial reports to the Congress, and provided that after the payment of the stadium bonds and interest, but not later than 2007, all right, title and interest in the stadium shall vest in the United States. 2 D.C. Code §§ 1728, 1725.

1. Emphasis in original; footnotes omitted.

2. Official statutory citations for the D.C. Code appear in the code following the cited code section.

Congress, in providing the financial arrangements for the Board's construction of the stadium, specifically limited the financial liability for this undertaking to the funds generated by the Board's bond issuances.

Nothing contained in this subchapter shall be construed to authorize or permit the Board or any member thereof to create any obligation or incur any liability other than such obligations and liabilities as are dischargeable solely from funds contemplated to be provided by this subchapter. No obligation created or liability incurred pursuant to this subchapter shall be a personal obligation or liability of any member or members of the Board but shall be chargeable solely to the funds contemplated to be provided by this subchapter. * * *[3]

During Congressional consideration of the District of Columbia Stadium Act, one of the House managers of the legislation explained this provision thusly:

"MR. McMILLAN. * * * The bill provides that the liabilities created by the Board and its members shall be restricted to those chargeable solely to the funds contemplated by this act. No indebtedness created pursuant to this act shall be an indebtedness of the District of Columbia or of the United States. * * *"[4]

Other Congressional debate on the act emphatically makes the same point that Congress intended to restrict construction funding of the stadium to the funds created by the Board's sale of bonds.

"MR. BARRETT. Does the Senator understand that under the provisions of the bill the construction would be carried out by the sale of bonds, and would not call for an appropiation by the United States Government?

"MR. LAUSCHE. I thoroughly understand that that is supposed to be the fact, and that this is supposed to be a self-liquidating project. * * *.

"MR. BARRETT. It is not a Federal project in the sense that Congress will appropriate money for it.

\* \* \* \* \* \*

"MR. BIBLE. I respect the Senator's right to object to the consideration of the bill. However, I should like to say to him that the bill has had the very careful consideration of our committee. The bill in no way requires Federal participation, with the exception of the original borrowing of $35,000 for the economic survey. Even that is merely a loan, which is to be repaid out of the sale of the bonds to be issued, which will be retired by revenues collected by the stadium. This is not a Federal project."[5]

\* \* \* \* \* \*

"MR. GROSS. Last year the House authorized $5 million for the building of a stadium at Cleveland, Ohio, but this year that was wiped out. There will be no stadium at Cleveland, Ohio. Congress did not make an appropriation for it. I am glad they did not.

"MR. HARRIS. If the gentleman will yield, that money was to be provided out of the Treasury of the United States. This is not. This is a private operation and will cost the Government nothing for the construction of the stadium, * * *."[6]

It is evident from an examination of the Congressional financing scheme enacted for the construction of the stadium and the legislative debate surrounding the stadium act that plaintiff's contract cannot be satisfied out of appropriated funds and that Congress has indicated that public funds shall not be involved. Accordingly, as in *Kyer, supra,* we cannot grant the relief requested.

Plaintiff attempts to avoid the jurisdictional bar of *Kyer* by contending that the United States owns the stadium, that its construction was a Federal project and that our prior decisions in

---

**3.** 2 D.C. Code § 1727.

**4.** 103 Cong. Rec. 6824 (1957).

**5.** 103 Cong. Rec. 13567 (1957).

**6.** 103 Cong. Rec. 15385 (1957).

*Butz Engineering Corp. v. United States,* 499 F.2d 619, 204 Ct.Cl. 561 (1974), and *Breitbeck v. United States,* 500 F.2d 556, 205 Ct.Cl. 208 (1974) provide a basis for court jurisdiction of the instant case.

We note in this regard that plaintiff in its opposition to defendant's motion did not come to grips with the *Kyer* case nor even refer to that case in its opposition. Rather, plaintiff chose to rebut the holding of *Kyer* by ignoring it, and relies instead on other factors which can be distinguished from the present case and *Kyer.* Plaintiff relies on several factors, notably the D.C. Circuit Court's decision in *Hecht v. Pro-Football, Inc.,* 144 U.S.App.D.C. 56, 444 F.2d 931 (1971), *cert. denied,* 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736 (1972), to establish the proposition that the Armory Board is a United States Government instrumentality, the Board's construction of the stadium was Federal Action and the Federal Government owns the stadium. Even accepting plaintiff's contentions as true, a point on which we express no opinion, the facts still remain that plaintiff's contract with the Board was not one which could be satisfied out of appropriated funds, and Congress unambiguously expressed the intent that public funds should not be involved in the construction of the stadium. Hence, under *Kyer, supra, Manning v. United States, supra,* and *Interdent Corp. v. United States,* 488 F.2d 1011, 203 Ct.Cl. 296 (1973), plaintiff's claim is not vindicable in this court. "It is not enough to say, as plaintiff does, that his contract was one to which the United States was a party." *Kyer v. United States, supra,* 369 F.2d at 718, 177 Ct.Cl. at 751.

Our prior decisions in *Butz Engineering Corp. v. United States, supra,* and *Breitbeck v. United States, supra,* provide no basis for court jurisdiction in the present case. Both decisions are readily distinguishable both on their facts and the issues involved from the instant case. In *Butz,* the court accepted jurisdiction over a contract claim involving the United States Postal Service, finding that Congress in reorganizing the Postal Service as an independent Government corporation had not intended to abandon general financial responsibility for the Postal Service. In the instant case, Congress specifically excluded the United States from financial liability for the Board's Construction of the stadium, and deliberately left the Board exclusively to private sources of funding. *Breitbeck,* a civilian pay case by employees of the Saint Lawrence Seaway Development Corporation, involved the question of whether disgruntled corporation employees had stated a "claim against the United States." *Breitbeck v. United States, supra,* 500 F.2d at 560, 205 Ct.Cl. at 214. The court accepted jurisdiction in that case, finding (1) that while the corporation was eventually to be self-financing, Congress intended to carry the project out of general Treasury or appropriated funds until such time as it was self-financing and (2) that plaintiff-employees were covered by the Classification Act, 5 U.S.C. § 5101 *et seq.*

In the present case, Congress, from the beginning, did not make available general Treasury or appropriated funds nor intended to make available such funds to the Board for the construction of the stadium. Additionally, the Board's employees were not covered by the Classification Act, 2 D.C. Code § 1726.

For the reasons stated, defendant's motion to dismiss is granted, and plaintiff's petition is dismissed.