GAJARSA, Circuit Judge,
dissenting,
with whom DYK, PROST, and O’MALLEY, Circuit Judges, join.
It has been settled law for more than half a century that the Tucker Act’s waiver of sovereign immunity does not apply to contracts entered into by nonappropriated fund instrumentalities (“NAFIs”) of the federal government. This settled law is recognized and endorsed by Congress and the Supreme Court. It is also settled law that no federal court may enlarge its jurisdiction; only Congress may do so. Nevertheless, the court today overturns and eviscerates the vast body of NAFI law in one fell swoop. The court is wrong to do so, and I therefore dissent.
A.
The central question here is what entities are included in the phrase “the United States” as used in the Tucker Act’s reference to claims founded “upon any express or implied contract with the United States.” 28 U.S.C. § 1491(a)(1). The term “United States” in that part of the Tucker Act is ambiguous as to whether it includes each and every Federal agency.[1] For more than sixty years the Supreme Court, our predecessor court, and our court have held that the term “United States” in the Tucker Act does not include NAFIs. The majority today eliminates the NAFI doctrine. The majority holds “that Tucker Act jurisdiction does not depend on and is not limited by whether the government entity receives or draws upon appropriated funds. Conflicting precedent shall no longer be relied upon.” Majority Op. at 1301. The sole question is whether “the government entity was acting on behalf of the government.” Id.
But the NAFI doctrine is not ours to eliminate; it is a long-standing doctrine of *1322 sovereign immunity born of the Supreme Court and recognized by Congress. As a court of appeals, we lack authority to abandon the doctrine. If we had a clean slate upon which to write new law, we could pursue a different path; however, we do not, and this court is not the legislative branch. The issue before this court— whether the Tucker Act waives the sovereign immunity of the United States for contractual commitments of the FDIC — is one of statutory construction. While the Tucker Act does not use the term “nonap-propriated funds instrumentality,” the statute and its legislative history must be read in the context of the Supreme Court’s decisions.
The genesis of the NAFI doctrine is found in the Supreme Court’s decision in Standard Oil Co. of California v. Johnson, 316 U.S. 481, 62 S.Ct. 1168, 86 L.Ed. 1611 (1942). In Standard Oil, the Court reviewed a California statute that imposed a license tax on the sale of motor vehicle fuel. 316 U.S. at 482, 62 S.Ct. 1168. The statute exempted “any motor vehicle fuel sold to the government of the United States or any department thereof for official use of said government.” Id. The question before the Court was whether a military post exchange qualified for the statute’s exemption. Id. at 483, 62 S.Ct. 1168. The Court held that the military post exchange was a federal instrumentality entitled to “whatever immunities it may have under the Constitution and federal statutes.” Id. at 485, 62 S.Ct. 1168. In classifying the post exchange as a federal instrumentality, the Court focused on the fact that “[t]he government assumes none of the financial obligations of the exchange.” Id. at 485, 62 S.Ct. 1168.
In the years following Standard Oil, the Court of Claims interpreted the decision as imposing a limitation on Tucker Act jurisdiction. In Borden v. United States, 116 F.Supp. 873 (Ct.Cl.1953) and Pulaski Cab Co. v. United States, 157 F.Supp. 955 (Ct.Cl.1958), the Court of Claims held it lacked jurisdiction to adjudicate breach of contract actions against military exchanges. See Borden, 116 F.Supp. at 877 (“[I]n light of [Standard Oil ] ... we reluctantly reach the conclusion that plaintiff cannot sue the United States on a contract of employment which is signed by the Army Exchange Service.... ”); Pulaski Cab, 157 F.Supp. at 958 (“We conclude that the United States has not consented to be sued upon a contract of this instrumentality....”). The Court of Claims reached a similar conclusion in Keetz v. United States, 168 Ct.Cl. 205, 1964 WL 8586 (1964) (per curiam), though it recognized the inequities engendered by dismissing the plaintiffs suit. Id. at 205 (“We are aware that plaintiff is placed in somewhat of a difficult position.... However, we believe that in these situations (especially where the question of the waiver of sovereign immunity is involved) it is up to Congress to remedy this apparent harsh result, and the courts should refrain from legislating by judicial fiat.”).
In Kyer v. United States the Court of Claims extended the NAFI doctrine beyond the realm of military exchanges by holding that the Grape Crush Administrative Committee (“Committee”), appointed by the Secretary of Agriculture, was a NAFI. 369 F.2d 714, 717-18 (Ct.Cl.1966).[2] *1323 According to the Court of Claims, because the Committee was “neither supported by appropriations nor authorized, in any manner, to obligate such funds,” it was a NAFI. Id. at 718. The court then held it lacked jurisdiction to adjudicate a breach of contract action against the Committee because “to remain within the framework of our jurisdiction, it is essential that the contract sued on be one which could have been satisfied out of appropriated funds.” Id. The Court of Claims reasoned that because its Tucker Act jurisdiction “must be read in conjunction with and must be regarded as limited by” 28 U.S.C. § 2517, which “provides that [Court of Claims] judgments are paid only from appropriated funds,” any suit against a NAFI for breach of contract is beyond its jurisdiction. Id. at 717-18.
It was against the backdrop of this history that Congress in 1970 amended the original Tucker Act to include a provision directly relevant to the NAFI doctrine and today’s ruling. As discussed above, the original Tucker Act provided the Court of Federal Claims with jurisdiction to hear, inter alia, a claim against the United States founded “upon any express or implied contract with the United States.” 28 U.S.C. § 1491(a)(1) (originally enacted as Tucker Act, ch. 359, 24 Stat. 505 (1887)). But Congress amended the original Tucker Act by adding the sentence: “For the purpose of this paragraph, an express or implied contract with the Army and Air Force Exchange Service, Navy Exchanges, Marine Corps Exchanges, Coast Guard Exchanges, or Exchange Councils of the National Aeronautics and Space Administration shall be considered an express or implied contract with the United States.” Act of July 23, 1970, Pub.L. No. 91-350, § 1(b), 84 Stat. 449 (“1970 Act”). As a textual matter, the amendment applies only to the enumerated entities in light of the canon expressio unius est exclusio al-terius (the express mention of one thing excludes all others). See, e.g., Tenn. Valley Authority v. Hill, 437 U.S. 153, 188, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978) (because the Endangered Species Act of 1973 “create[d] a number of limited ‘hardship exemptions’ ” and “no exemptions ... for federal agencies,” the Court found “under the maxim of expressio unius est exclusio alterius ... that these were the only ‘hardship cases’ Congress intended to exempt”); cf. Nat’l R.R. Passenger Corp. v. Nat’l Ass’n of R.R. Passengers, 414 U.S. 453, 458, 94 S.Ct. 690, 38 L.Ed.2d 646 (1974) (noting the “frequently stated principle of statutory construction ... that when legislation expressly provides a particular remedy or remedies, courts should not expand the coverage of the statute to subsume other remedies”). This appropriately narrow construction is further consistent with the general rule that “a waiver of the Government’s sovereign immunity will be strictly construed, in terms of its scope, in favor of the sovereign” and that such a waiver “must be unequivocally expressed in [the] statutory text,” Lane v. Pena, 518 U.S. 187, 192, 116 S.Ct. 2092, 135 L.Ed.2d 486 (1996). That Congress intended and understood the amendment as extending Tucker Act jurisdiction only to the listed NAFI entities — to the exclusion of all others — is unequivocally confirmed by the amendment’s legislative history.
Congress amended the Tucker Act in 1970 in part due to its concern that the NAFI doctrine created an inequitable loop-hole in the Tucker Act. Indeed, the original Senate bill sought to eliminate the NAFI doctrine entirely. It provided that “an express or implied contract with a nonappropriated fund activity of or under the United States or a department or agency of the United States shall be considered an express or implied contract with the United States.” S. 980, 91st *1324 Cong. (1st Sess.1969). The Senate report stated that:
S. 980 will fill a gap in the Tucker Act’s waiver of immunity of the United States to claims based upon contracts with departments or agencies of the Government. ... The courts have repeatedly held ... that the Federal Government’s liability to suit under [the Tucker Act] only exists with respect to contract obligations to be paid out of appropriated funds. See, e.g., Kyer v. United States, 369 F.2d 714 (Ct.Claims 1966); Pulaski Cab Co. v. United States, 157 F.Supp. 955 (Ct.Claims 1968); Keetz v. United States, 168 Ct. Claims 205 [1964 WL 8586] (1964); Borden v. United States, 116 F.Supp. 873 (Ct.Claims 1953).
Despite [the] consistent identification of the nonappropriated fund activity with its parent department or agency and the United States, contractors with such activities have found it impossible to get a “day in court” when they allege breach of contract by such activities. Your committee believes that there is no rational reason to continue the immunity from contract suit presently afforded no-nappropriated fund activities....
... In so doing, S. 980 will erase an anachronistic and baseless distinction between suits on contracts of the United States to be paid out of appropriated funds and those to be paid out of nonap-propriated funds.
S.Rep. No. 91-268, at 2-3, 5 (1969).
The House, however, strongly disagreed with the Senate’s proposed elimination of the entire NAFI doctrine. The House report stated:
In evaluating the proposal as passed by the Senate, your committee concluded that the complete removal of sovereign immunity for all nonappropriated fund activities would be undesirable for several reasons:
First, since not every nonappropriated fund activity has sufficient assets to reimburse the United States [for the cost of a judgment, as required by S. 980], the cost of the judgment would in some cases be imposed on the taxpayer — a result which is inconsistent with the very concept of nonappropriated fund activities.
Second, the broad inclusion of all no-nappropriated fund activities might create serious definitional questions, making it difficult to predict the outer limits of the liability of the Federal Government.
Third, data concerning all of the no-nappropriated fund activities of the United States is unavailable. The Bureau of the Budget has not compiled such data nor can such data be obtained from the various Government agencies under which nonappropriated fund activities are conducted. Clearly, Congress ought not to expose the Federal Government to liability for all nonappropriated fund activities unless such data is assembled.
H.R.Rep. No. 91-933, at 3 (1970), reprinted in 1970 U.S.C.C.A.N. 3477, 3479 (emphasis in original).[3] Accordingly, the House amended the bill, limiting the NAFI exclusion to military post exchanges and NASA exchange councils. Id. The House version of the bill passed, 1970 Act § 1(b), 84 Stat. at 449, and the NAFI doctrine, albeit limited by the Congress, remains in effect today, 28 U.S.C. § 1491(a)(1). By making clear that some NAFIs are within *1325 the definition of the “United States” for purposes of the Tucker Act, Congress made quite clear that other NAFIs are excluded. The majority’s conclusion— premised on its interpretation of the legislative history to support its rationale that Congress eliminated all NAFIs — is illogical, just like talking about the shining moonlight on a sunny afternoon. There is simply no support for the majority’s assertion that “[t]he legislative and judicial histories of the 1970 amendment stress the restoration of the full scope of the Tucker Act’s waiver of immunity, without imposing limitations grounded in the source of the government entity’s funds.” Majority Op. at 1314.
Consistent with this background, this court has repeatedly interpreted the 1970 Act as “a narrow exemption from the [NAFI] doctrine for certain entities,” which left “the doctrine intact for all other non-appropriated fund instrumentalities unrelated to the post exchanges and exchange councils.” Furash & Co. v. United States, 252 F.3d 1336, 1339 (Fed.Cir.2001); see also Lion Raisins, Inc. v. United States, 416 F.3d 1356, 1365 (Fed.Cir.2005); AINS, Inc. v. United States, 365 F.3d 1333, 1338-39 (Fed.Cir.2004); El-Sheikh v. United States, 177 F.3d 1321, 1325 (Fed.Cir.1999); McDonald’s Corp. v. United States, 926 F.2d 1126, 1129-33 (Fed.Cir.1991). In doing so, this court correctly reasoned that had Congress intended to eliminate the doctrine entirely, it would have adopted the Senate bill, not the House’s amended version. Congress’s action, therefore, speaks volumes. By leaving the doctrine in place, Congress ratified the Supreme Court decisions and our decisions defining it.[4]
Our analysis is confirmed by the Supreme Court’s consistent teaching that a narrow statutory exception, crafted in response to specific judicial decisions, demonstrates Congress’s awareness of those decisions. More specifically, the Court teaches that such an exception “lends powerful support” to the continued viability of the larger rule. Square D Co. v. Niagara Frontier Tariff Bureau, Inc., 476 U.S. 409, 418-19, 106 S.Ct. 1922, 90 L.Ed.2d 413 (1986). For example, in Maislin Industries, U.S., Inc. v. Primary Steel, Inc., the Court held that a statutory exception, exempting motor contract carriers from the decades-old filed-rates doctrine, “demonstrat[ed] that Congress is aware of the requirement and has deliberately chosen not to disturb it with respect to motor common carriers.” 497 U.S. 116, 135, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990). Similarly, in Square D, the Court refused to overturn a long-standing judicial doctrine when Congress specifically addressed a particular application, but declined to alter the larger rule. 476 U.S. at 418-20, 106 S.Ct. 1922. Such rules of interpretation are corollary to the strong disfavor shown reversals of long-standing law. See III. Brick Co. v. Illinois, 431 U.S. 720, 736, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977) (“[W]e must bear in mind that considerations of stare decisis weigh heavily in the area of statutory construction, where Congress is free to change this Court’s interpretation of its legislation”); cf. Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., 535 U.S. 722, 739, 122 S.Ct. 1831, 152 L.Ed.2d 944 (2002) (courts must use caution before adopting changes that disrupt settled expectations).
*1326 Moreover, we are not alone in considering the significance of the 1970 Act, as the Supreme Court addressed the act in United States v. Hopkins, 427 U.S. 123, 96 S.Ct. 2508, 49 L.Ed.2d 361 (1976). In Hopkins, the Court considered whether a civilian employee of the Army and Air Force Exchange Service could sue the United States for breach of an employment contract with the exchange. Id. at 124, 96 S.Ct. 2508. The Court first noted that its Standard Oil decision had formed “the basis of a series of decisions by the Court of Claims to the effect that it lacked jurisdiction over claims concerning the activities of nonappropriated fund instrumen-talities.” Id. at 125, 96 S.Ct. 2508 (citing Borden, Pulaski, and Kyer). The Court took no exception with the Court of Claims’ interpretation of Standard Oil, specifically defined a nonappropriated fund instrumentality as “one which does not receive its monies by congressional appropriation,” id. at 125 n. 2, 96 S.Ct. 2508, and stated that “[t] he nonappropriated-fund status of the exchanges places them in a position whereby the Federal Government, absent special legislation, does not assume the obligations of those exchanges in the manner that contracts entered into by appropriated fund agencies are assumed,” id. at 127, 96 S.Ct. 2508. The Court then found such “special legislation” in the 1970 Act, which specifically addressed Keetz’s call for a Congressional remedy to the NAFI doctrine’s apparent harsh result by providing that contracts with military exchanges shall be considered contracts with the United States. See id. at 125-26, 96 S.Ct. 2508 (“The purpose of the bill was clearly to provide a remedy to ‘contractors’ with nonappropriated fund instrumentalities.”). According to the Court, the 1970 Act waived the sovereign immunity of the United States and conferred jurisdiction on the Court of Claims for breach of contract claims against military exchanges. Id. The Supreme Court therefore recognized that the 1970 Act was, as we subsequently stated, “a narrow exemption from the [NAFI] doctrine for certain entities.” Furash, 252 F.3d at 1339.
Our statutory construction of the Tucker Act finds further support in the legislative history of the Contract Disputes Act, 41 U.S.C. §§ 601-613 (“CDA”). The CDA permits contractors to sue the federal government for breach of contract and applies “to any express or implied contract (including those of the non-appropriated fund activities described in sections 1346 and 1491 of title 28) entered into by an executive agency for ... (2) the procurement of services.” Id. § 602.
Following the CDA’s passage, a question was raised whether the Tucker Act’s NAFI doctrine applied with equal vigor to the CDA. We addressed this question in Furash and, in doing so, considered the CDA’s legislative history. See 252 F.3d at 1342-44. We concluded that “for CDA jurisdiction to be foreclosed, Congress must make clear that the activity in question was intended to operate without appropriated funds, the same standard that is used under the Tucker Act.” Id. at 1342. To bolster our conclusion, we turned to the CDA’s legislative history, “which makes clear that Congress did not intend for the CDA to apply to non-appropriated fund instrumentalities except for those specifically identified in the [Tucker] Act.” See id. at 1343^4. We pointed to a Senate report, which explicitly addressed the NAFI doctrine:
The bill expressly states its applicability to those nonappropriated fund activities over which the courts presently have jurisdiction under 28 U.S.C. 1346 and 1491. Consideration was given to including all nonappropriated fund activities. However, since the court’s present jurisdiction over nonappropriated fund *1327 contracts is limited to certain post exchanges, and as there appears to be no problem with remedies relating to other nonappropriated fund activities, it was deemed unnecessary to include all or any additional nonappropriated fund activities within the scope of the bill.
Id. at 1348 (quoting S.Rep. No. 95-1118, at 18 (1978), reprinted in 1978 U.S.C.C.A.N. 5235, 5252). This legislative history led us to the “inescapable” conclusion “that Congress was aware of the non-appropriated funds doctrine and that it did not intend for the CDA to expand the court’s jurisdiction to reach non-appropriated fund activities other than those specifically identified in the Tucker Act and incorporated by reference in the CDA.” Id. at 1343-44.
The CDA’s legislative history not only confirms that the NAFI doctrine applies to the CDA, it also reinforces our court’s consistent view of the 1970 Act as “a narrow exemption from the [NAFI] doctrine for certain entities.” Id. at 1339. The Senate report states that, as of 1978, the Court of Claims’ “present jurisdiction ... is limited to certain post exchanges.” S.Rep. No. 95-1118, at 18, 1978 U.S.C.C.A.N. 5235, 5252 (emphasis added). This is unequivocal congressional recognition that the 1970 Act is a narrow exemption to, not a broad abandonment of, the NAFI doctrine. Moreover, the Senate report states that “as there appears to be no problem with remedies relating to other nonappropriated fund activities, it was deemed unnecessary to include all or any additional nonappropriated fund activities within the scope of the bill.” Id. Again, this is unequivocal congressional recognition that NAFIs include more than military post exchanges and that the 1970 Act leaves these “additional” activities untouched.
The CDA’s legislative history takes on greater importance when one considers that in the eight years between the 1970 Act and the CDA, the Court of Claims continued to expand the NAFI doctrine beyond military exchanges and did so relying on the same reasoning the majority abandons today. For instance, in McCloskey & Co. v. United States, the Court of Claims held that the District of Columbia Armory Board was a NAFI and that the United States, therefore, was not subject to suit in the Court of Claims for breach of a contract entered into by the Board. 530 F.2d 374, 378 (Ct.Cl.1976). In explaining the scope of the Tucker Act, the court, quoting Kyer extensively, reasoned that the Tucker Act is limited by 28 U.S.C. § 2517. Similarly, in Novid Co. v. United States, the Court of Claims found that the Army Corp of Engineers acted as a NAFI when it entered into a construction contract that was not to be paid through general appropriations. 535 F.2d 5, 6-8 (Ct.Cl.1976). Given the Army Corp of Engineers’ NAFI status, the court held that the United States could not be sued for breach of the construction contract. Id. Like McCloskey, the court again justified its decision with reference to Kyer's reasoning. Id. Despite the continued growth of the NAFI doctrine and the Court of Claims’ continued reliance on Ayer’s reasoning, Congress “deemed [it] unnecessary to include all or any additional nonapprop-riated fund activities within the scope of the [CDA].” S.Rep. No. 95-1118, at 18, 1978 U.S.C.C.A.N. 5235, 5252.
To summarize: contrary to the majority, the text of the Tucker Act and the legislative history surrounding the 1970 Act both confirm that the 1970 Act provided only a limited exception to the NAFI doctrine. Congress expressly revoked the NAFI doctrine for certain NAFIs (military and NASA exchanges), but it left all other NAFIs untouched. This interpretation is implicitly supported by the maxim of ex- *1328 pressio unius est exclusio alterius and explicitly supported by the act’s legislative history and text.
The rationale expounded by the majority is flawed because both Congress and the Supreme Court have endorsed the NAFI doctrine. The doctrine serves to shield the public fisc from liability incurred by self-funded federal entities. Absent appropriations and specific statutory contractual authority, these federal entities are not endowed with the power to contractually bind the United States government. Abandoning the doctrine, as the majority has done today, opens a door to the Court of Federal Claims that both Congress and the Supreme Court have kept shut for the past six decades.
B.
In my view, under Supreme Court precedent and our precedent, the FDIC is clearly a NAFI because it receives no appropriated funds and is, moreover, a separate entity with independent authority to sue and be sued. Consequently, the FDIC is not subject to suit in the Court of Federal Claims in actions alleging breach of contract.
In Hopkins, the Supreme Court described a NAFI as “one which does not receive its monies by congressional appropriation.” 427 U.S. at 125 n. 2, 96 S.Ct. 2508; see also Standard Oil, 316 U.S. at 485, 62 S.Ct. 1168 (focusing on receipt of funds for operational purposes). Using this test as our starting point, our role is to determine whether Congress clearly intended to create an entity whose activities are to be independent of Treasury funds, particularly to the extent those activities give rise to the dispute lodged in the Court of Federal Claims. In making this determination, we must examine the governmental entity in question, the relevant activities of the entity, and the entity’s enabling statute. We look primarily to the source of the entity’s operational funds and its ability to sue and be sued as a separate entity. To the extent our prior cases have departed from the Supreme Court’s standard for determining NAFI status, I believe those cases were incorrectly decided.
Turning to the case at hand, both parties rely upon and focus their arguments almost exclusively on the four-part test set forth in AINS, 365 F.3d at 1342-43. While AINS summarizes the development and application of the NAFI doctrine in this court, to the extent it has been read to set forth a new rigid test for NAFI status, such a reading sweeps too broadly. And while I conclude that the FDIC would be a NAFI under the AINS test, I caution against elevating AINS above our obligation to assess the jurisdictional question posed in light of the Supreme Court’s directives in Hopkins and Standard Oil.
Examining the pertinent facts here, the FDIC is clearly a NAFI such that breach of contract actions against it are not cognizable in the Court of Federal Claims. As a starting point, the FDIC does not receive funding through congressional appropriation. There is no provision within the FDIC’s enabling statute authorizing the appropriation of funds to the Deposit Insurance Fund (“DIF”), the fund the FDIC uses to perform its insurance and regulatory functions. Simply put, the FDIC is a self-funded entity.[5] The FDIC receives its *1329 funding from assessments on member banks, 12 U.S.C. § 1817(b), and the FDIC’s enabling statute does not provide for the appropriation of general funds to defray the FDIC’s expenses. In fact, Congress strictly limited the FDIC’s ability to incur obligations, see id. § 1825(c)(5), and expected the FDIC to make special assessments upon member banks when it requires additional funds, see id. § 1817(b)(5).[6] Until the majority’s opinion today, this court has found such assessment powers significant to the NAFI analysis. For instance, in Furash we held that the Federal Housing Finance Board (“Finance Board”) was a NAFI because it was self-funded funded “through assessments against federal home loan banks, not from general fund revenues.” 252 F.3d at 1341. The Finance Board’s assessment powers were nearly identical to the FDIC’s, including the ability to make emergency assessments in the event of an asset deficiency. Compare 12 U.S.C. § 1438(b)(2) (2006) (repealed 2008) with 12 U.S.C. § 1817(b)(5). Similarly, we found the Federal Reserve Board to be a NAFI in part because it was self-funded through assessments. Denkler v. United States, 782 F.2d 1003, 1005 (Fed.Cir.1986).
Not only is the FDIC self-funded, it is statutorily required to separate its money from the general fund of the United States. First, all funds collected through assessments must be placed in the DIF, not the general fund of the United States. See 12 U.S.C. § 1821(a)(4)(D). Second, Congress provided that the DIF’s funds are not subject to apportionment. Pursuant to 12 U.S.C. § 1817(d), any “amounts received pursuant to [the FDIC’s assessment power] and any other amounts received by the [FDIC] shall not be subject to apportionment for the purposes of chapter 15 of Title 31 or under any other authority.” In Furash, we found that strikingly similar language in the Finance Board’s enabling statute supported classifying the Finance Board as a NAFI. See Furash, 252 F.3d at 1341 (discussing 12 U.S.C. § 1422b(c)). Likewise, in Core Concepts of Florida, Inc. v. United States, we held that the Federal Prison Industries is a NAFI in part because its enabling statute made “clear that [Federal Prison Industries’s] funds are to be kept distinct from general federal revenues.” 327 F.3d 1331, 1336 (Fed.Cir.2003).
These provisions make clear that the FDIC is a self-funded entity. As a self-funded entity, the FDIC lacks authority to obligate appropriated funds.[7] The United *1330 States is thereby not bound by the FDIC’s contractual commitments and cannot be sued in the Court of Federal Claims. See Lion Raisins, 416 F.3d at 1366.
C.
In passing, the majority suggests that the above precedent is inapplicable simply because the FDIC can borrow money from the Treasury. I, however, believe there is a fundamental distinction between allowing an entity to borrow funds from the Treasury and appropriating funds to that entity. In the former scenario, the entity retains its self-funded status, and it alone is responsible for its contractual commitments. In the latter scenario, the unfettered use of taxpayer dollars evidences congressional intent to share responsibilities for the entity’s contractual commitments. This distinction is the essence of the NAFI doctrine.
Before demonstrating why borrowing is substantively different from receiving appropriations, it is fitting to examine the clear restrictions imposed upon the FDIC’s borrowing authority. First, any funds borrowed can only be used “for insurance purposes.” 12 U.S.C. § 1824(a). Second, while the FDIC may borrow from the Treasury to fund the DIF, such borrowing requires an agreed upon repayment schedule and a demonstration by the FDIC that its income from assessments will be sufficient for timely repayment of principal and interest. Id. § 1824(c). To ensure prompt repayment of any Treasury loan, Congress authorized the FDIC to levy “Emergency Special Assessments” on its member institutions if “necessary ... to provide sufficient assessment income to repay amounts borrowed from the Secretary of the Treasury.” Id. § 1817(b)(5). It is this assessment authority that led Senator Michael Crapo during debate on the Helping Families Save Their Homes Act of 2009 to state that “[i]t is important to note that this borrowing authority is not coming from taxpayer dollars. The levies and the assessments that are made on the participants in the financial industry themselves, the depository institutions, are the source of the dollars that would cover this loan authority.” 155 Cong. Rec. S5088, S5093 (May 5, 2009) (emphasis added). Finally, while the Secretary of the Treasury is “directed to loan” money to the FDIC, ultimately, the loan is purely discretionary and “subject to the approval of the Secretary of the Treasury.” 12 U.S.C. § 1824(a)(1). Moreover, if the Secretary does decide to loan the FDIC money, the statute requires that the FDIC pay interest on the loan “not ... less than an amount determined by the Secretary ... taking into consideration current market yields.” Id. § 1824(a)(1). This requirement of interest payments is significant because it demonstrates both the FDIC’s independent operation and Congress’s intent to shield taxpayers from even indirect funding of the FDIC. Considerable weight must be given to the significant limits Congress placed on the FDIC’s ability to borrow from the Treasury.[8]
*1331 Even if the FDIC’s borrowing authority was largely unrestricted, borrowing is substantively different from receiving appropriations. Indeed, neither this court nor the Court of Federal Claims has found an instrumentality’s ability to borrow funds precludes application of the NAFI doctrine. For example, in AINS we held that the U.S. Mint was a NAFI even though the Mint’s enabling statute permits it to borrow money from the Treasury if needed. See 365 F.3d at 1344; 31 U.S.C. § 5136 (authorizing the Mint to borrow from the Treasury). The Court of Federal Claims has similarly distinguished between appropriated money and borrowed money. In Aaron v. United States, 51 Fed.Cl. 690, 692 (2002) judgment vacated in part on other grounds Aaron v. United States, 52 Fed.Cl. 20 (2002), the court had to determine whether the Federal Prison Industries, Inc. (“FPI” a/k/a “UNICOR”) was a NAFI. The plaintiff argued that the FPI could not be a NAFI because it borrowed $20 million from the Treasury to purchase equipment. See id. The court rejected the plaintiffs argument and found the FPI to be a NAFI because “[a]n appropriation is very different from a loan ... which must be repaid.” Id. And, in McCloskey & Co. v. United States, the Court of Claims considered whether the District of Columbia Armory Board (“Armory Board”) was a NAFI. 530 F.2d 374, 375 (Ct.Cl.1976). The plaintiff entered into a contract with the Armory Board for the construction of RFK Stadium. Id. at 375-76. Congress authorized the Armory Board to issue bonds to pay for the construction of the stadium, but also provided that the Armory Board could borrow funds from the Treasury if the funds from bonds were insufficient. See id. at 376. Despite the ability to borrow funds, the court held that the Armory Board was a NAFI because Congress intended for the construction to be paid from non-appropriated funds. See id. at 377.
The distinction between borrowing and appropriating is made even clearer when one considers Congress’s actions during the savings and loan crisis. In response to that crisis, Congress dissolved the Federal Savings and Loan Insurance Corporation (“FSLIC”) by passing the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (“FIRREA”), Pub.L. 101-73, 103 Stat. 183. Prior to its dissolution, the FSLIC was to savings and loan institutions what the FDIC is today to commercial banks, i.e., it had “responsibility to insure thrift deposits and regulate all federally insured thrifts.” United States v. Winstar Corp., 518 U.S. 839, 844, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). The combination of high interest rates and inflation in the late 1970s and early 1980s caused hundreds of savings and loan institutions to fail. See id. at 845, 116 S.Ct. 2432. Various legislative actions performed during the mid-1980s proved insufficient to ameliorate the crisis and “the multitude of already-failed savings and loans confronted FSLIC with deposit insurance liabilities that threatened to exhaust its insurance fund.” Id. at 846, 116 S.Ct. 2432. In response, Congress passed FIRREA, which abolished the FSLIC and transferred its insurance functions to the FDIC. Id. at 856, 116 S.Ct. 2432.
Congress, however, did not transfer the FSLIC’s assets and liabilities to the FDIC. Instead, it created a separate fund — the FSLIC Resolution Fund — to house all of the FSLIC’s assets and liabilities. See 12 U.S.C. § 1821a. Congress then provided *1332 that “[a]ny judgment resulting from a proceeding to which the [FSLIC] was a party-prior to its dissolution or which is initiated against the [FDIC] with respect to the [FSLIC] or with respect to the FSLIC Resolution Fund shall be limited to the assets of the FSLIC Resolution Fund.” 12 U.S.C. § 1821a(d). In other words, all suits against the FSLIC or the FDIC (in its capacity as the FSLIC’s successor) were to be paid from the FSLIC Resolution Fund. This is why “past payments on Winstar judgments are withdrawn from the FSLIC Resolution Fund.” See Home Sav. of Am., F.S.B. v. United States, 69 Fed.Cl. 187, 191 (2005).
In addition to the FSLIC’s existing assets, the FSLIC Resolution Fund is funded by (1) “[i]ncome earned on assets of the FSLIC Resolution Fund,” (2) “[l]iquidating dividends and payments made on claims received by the FSLIC Resolution Fund from receiverships,” and (3) “[a]mounts borrowed by the Financing Corporation.” 12 U.S.C. § 1821a(b). Importantly, however, the FSLIC Resolution Fund also receives complete Treasury backup. Specifically, Congress provided that if the FSLIC Resolution Fund’s assets ever became “insufficient to satisfy the liabilities of the FSLIC Resolution Fund, the Secretary of the Treasury shall pay to the Fund such amounts as may be necessary, as determined by the [FDIC] and the Secretary, for FSLIC Resolution Fund purposes.” Id. § 1821a(c). Treasury backing of the FSLIC Resolution Fund is mandatory, not discretionary. Id. (“[T]he Secretary of the Treasury shall pay to the Fund_” (emphasis added)).
The differences between the FDIC’s DIF and the FSLIC Resolution Fund are striking and underscore the distinction between a Congressional appropriation and a Congressional loan. Unlike loans authorized for the DIF, the FDIC has no obligation to repay any funds paid from the Treasury to the FSLIC Resolution Fund. See id. § 1824 (requiring repayment plan and demonstration that the FDIC has sufficient income to repay Treasury loan for DIF). Moreover, we have held that to the extent the FSLIC Resolution Fund is depleted, the “Treasury is required to disburse funds to the [FSLIC Resolution Fund].” Landmark Land Co. v. United States, 256 F.3d 1365, 1381 (Fed.Cir.2001) (citing 12 U.S.C. § 1821a(c)); see also id. (“[E]ven if the FRF-FSLIC Fund were drained of all assets due to payment of damages for claims brought by the FDIC in the numerous Winstar-related cases, the government remains obligated to fully fund the FRF.”). In contrast, there is no statutory requirement that the Secretary of the Treasury lend money to the FDIC for the DIF. See 12 U.S.C. § 1824(a)(1) (authorizing Treasury loan “subject to the approval of the Secretary of the Treasury”). The FSLIC Resolution Fund, therefore, illustrates how Congress appropriates funds to an entity, while the DIF illustrates how Congress makes available a loan to an otherwise self-supporting institution. The distinction between the two is fundamental to the NAFI doctrine. In the former scenario Congress subjects itself to contractual liability under the Tucker Act because appropriations are implicated, while in the latter scenario such contractual liability does not exist. The majority fails to appreciate this legal distinction.
D.
The majority also finds support for its conclusion in congressional statements that “stress the full faith and credit of the United States in connection with the FDIC.” Majority Op. at 1318. But these statements are directed to the FDIC’s obligations to depositors, not its contract obligations, see, e.g., Senate Concurrent Res *1333 olution 72 (128 Congressional Record S4580) (Mar. 17, 1982), and they do not have the force of a statutory obligation in any event. The relevant inquiry is whether the FDIC’s current enabling statute contains an express commitment of appropriated funds. It does not.
The savings and loan crisis once again provides a lucid example. Faced with the potential collapse of the entire savings and loan industry, Congress did not simply appropriate funds to the FSLIC. Instead, it passed FIRREA, dissolved the FSLIC, and created the FSLIC Resolution Fund with an express Treasury backup. It was politically expedient to provide the FSLIC with appropriated funds, but political expediency did not extirpate the need to amend FSLIC’s enabling statute. The same is true with the FDIC, A statutory authorization is essential to appropriate funds. See AINS, 365 F.3d at 1342 (holding that an entity is a NAFI if, inter alia, it is entitled to use appropriated funds only through a statutory amendment).
To the extent the majority gives congressional statements weight, it is relevant to note that Congress has consistently stated that the FDIC is a self-funded agency not dependent upon taxpayer funds. For example, during recent debate on the Continuing Extension Act of 2010, Senator Barbara Boxer aptly explained: “I think the American people have appreciated the FDIC over the years, because the FDIC was another way for taxpayers to be kept out of a problem, because it is an insurance fund. The banks are taxed and they put the money into the fund.” 156 Cong. Rec. S2341, S2353 (Apr. 15, 2010). Similarly, Representative Brad Sherman stated “the FDIC collects an insurance premium from the banks so it would be the financial system, not the American taxpayer, paying the cost of taking care of this risk.” 154 Cong. Rec. H10690, H10691 (Oct. 2, 2008). While these statements largely support my view of the FDIC, I cite them not for support, but to illustrate that the majority’s reliance on select Congressional statements is erroneous.
If Congress wants to appropriate funds to the FDIC, it must do so through amending the FDIC’s enabling statute, not through generalized statements of support. When Congress sought to “bail out” the savings and loan industry, it amended the FSLIC’s enabling statute to create the FSLIC Resolution Fund and provide it express Treasury backup. Any comparable “bail out” of the FDIC would require a similar amendment to the FDIC’s enabling statute because the FDIC is otherwise barred from using appropriated funds.
E.
A finding by this court that the FDIC is a NAFI would not close the courthouse doors on plaintiffs like Frank Slattery. The FDIC’s enabling statute contains a “sue and be sued” provision. See 12 U.S.C. § 1819(a) (“[T]he Corporation shall become a body corporate and as such shall have power ... [t]o sue and be sued, and complain and defend, by and through its own attorneys, in any court of law or equity, State or Federal.”). This provision is a waiver of the FDIC’s sovereign immunity. See Woodbridge Plaza v. Bank of Irvine, 815 F.2d 538, 542-43 (9th Cir.1987) (“The ‘sue-and-be-sued’ language of 12 U.S.C. § 1819 (Fourth) is a general waiver of sovereign immunity from claims brought against the FDIC.”). Accordingly, suits such as Mr. Slattery’s can be brought against the FDIC in district court. See Brief of the United States at 25, n. 3 (“Slattery could have brought suit against the FDIC in United States district court pursuant to 12 U.S.C. § 1819(a).”). This is true, even if the plaintiff seeks money damages. See Far W. Fed. Bank v. Office *1334 of Thrift Supervision, 930 F.2d 883, 889 (Fed.Cir.1991) (listing cases from eight circuits in which the FDIC’s “sue and be sued” clause permitted suits for money-damages in district court).
If Mr. Slattery had brought his suit in district court, any judgment he received against the FDIC would be paid from the DIF. See Karstens Prods., Inc. v. F.D.I.C., No. 95-1392, 1995 WL 769019, at *4 (Fed.Cir.1995) (unpublished) (“[I]n Far West [Federal Bank v. Office of Thrift Supervision, 930 F.2d 883, 890 (Fed.Cir.1991) ] we held that recovery in an action against the FDIC is limited to funds in the FDIC’s possession and control and that such an action is not one against the United States.”). Importantly, the FDIC could not borrow from the Treasury if Mr. Slattery’s judgment exceeded the DIF’s assets because the FDIC’s borrowing authority is limited to its insurance functions. See 12 U.S.C. § 1824(a) (“The Corporation is authorized to borrow from the Treasury ... such funds as ... are from time to time required for insurance purposes....” (emphasis added)). Instead, the FDIC would need to impose an emergency assessment on insured depository institutions to satisfy the judgment. See Id. §§ 1817(b)(5) (providing the FDIC with the authority to impose an emergency assessment “for any other purpose that the Corporation may deem necessary”); 1817(b)(2)(B)(ii) (providing that in determining the amount to assess banks, the Director should take into account any “case resolution expenses”). Accordingly, Mr. Slattery can bring his suit against the FDIC; he simply must do so in district court and is limited to those funds that the FDIC has acquired through its corporate activities or can acquire through an emergency assessment.
Likewise, a finding that the FDIC is a NAFI would not prevent depositors from bringing suits against the FDIC concerning their deposits. In the event of a bank failure, the FDIC must provide depositors with their insured deposits “as soon as possible.” Id. § 1821(f)(1). Recognizing that there were likely to be disputes over deposits, Congress provided the FDIC with discretion to promulgate regulations for resolving deposit disputes. See id. § 1821(f)(3). When the FDIC resolves a dispute, its determination is a “final determination” subject to appeal in the “United States district court for the Federal judicial district where the principal place of business of the depository institution is located.” 12 U.S.C. § 1821(f)(4). Therefore, if we correctly hold that the FDIC is a NAFI, we will not disrupt Congress’s prescribed method for resolving depositor disputes because our holding would only affect the Court of Federal Claims’ jurisdiction, not the district court’s.[9]
F.
Because the majority rules that the FDIC is not a NAFI, the United States is *1335 now directly liable for the FDIC’s contractual commitments. Mr. Slattery and future plaintiffs like him can now sue the United States in the Court of Federal Claims and will receive money damages directly from the Judgment Fund. See McCarthy v. United States, 670 F.2d 996, 1002 (Ct.Cl.1982) (“[O]ur judgments, when awarded against the United States, are normally payable not from appropriations to maintain the agency that incurred the liability, but from appropriations made for the purpose of paying Court of Claims and other court judgments, now normally standing appropriations.”). The FDIC, however, has no statutory obligation to reimburse the government for any damages paid out of the Judgment Fund. Accordingly, from this date forth, taxpayers, not the FDIC, shall bear the burden of the FDIC’s contractual commitments.
The majority affords the FDIC complete insulation from liability. This insulation stands in stark contrast to Congress’s requirement that those NAFIs specifically identified in the 1970 Act reimburse the government for any liability incurred by their breach of contract. See 31 U.S.C. § 1304(c)(2) (“The Exchange making the contract shall reimburse the Government for the amount paid by the Government.”); El-Sheikh, 177 F.3d at 1325 (discussing the reimbursement obligation). The Army and Air Force Exchange Service must reimburse the government if a suit is brought against the United States for its actions, but the FDIC has no similar obligation. No policy reason exists to justify this disparate treatment. The most logical conclusion is that Congress never envisioned the United States being held liable for the FDIC’s contractual commitments and therefore never saw a need to require reimbursement.
Startlingly, under the majority’s analysis, taxpayers bear a heavier burden than they did when Congress bailed out the savings and loan industry in 1989. While the FSLIC Resolution Fund enjoys full Treasury backup, the backup is a “last resort,” only to be called upon if the FSLIC’s other assets are exhausted. See 12 U.S.C. § 1821a(c) & (d). Under the majority’s holding, the FDIC need not exhaust any of its assets because the government is directly liable. In other words, the majority has by judicial fiat created a more direct bailout than the 1989 Congressional bailout of the savings and loan industry. When Congress bails out a federal corporation, it requires the corporation to expend all its assets first; when the Federal Circuit bails out a federal corporation, it asks taxpayers to foot the entire bill. Because I do not support this alarming result, I dissent.

. Notably, the term "United States" in the earlier part of the Tucker Act referring to "any claim against the United States” does not include separate Federal agencies. The Tucker Act does not authorize suit against Federal agencies, only the United States itself. Hansen v. United States, 214 Ct.Cl. 823, 1977 WL 25876 at *1 (Ct.Cl.1977) (unpublished); see also United States v. Sherwood, 312 U.S. 584, 588, 61 S.Ct. 767, 85 L.Ed. 1058 (1941). This clearly suggests that the term "United States” elsewhere in the statute does not include all Federal agencies

. The majority recognizes that Kyer’s extension of the NAFI concept beyond military exchanges is the direct ancestor of the NAFI doctrine, citing its progeny: Furash & Co. v. United States, 252 F.3d 1336 (Fed.Cir.2001), Core Concepts of Florida, Inc. v. United States, 327 F.3d 1331 (Fed.Cir.2003), and AINS, Inc. v. United States, 365 F.3d 1333 (Fed.Cir.2004). Majority Op. at 1309-10. The majority then attempts to distinguish Kyer and ultimately overturns it.

. The majority cites to the same language but refuses to accept its import: namely, that the House explicitly rejected the Senate’s complete elimination of the NAFI doctrine.

. The majority's contrary argument — that Congress’s choosing to enact only a narrow exception to the NAFI doctrine offers no guidance as to the continued viability of the doctrine itself — cites no authority, Majority Op. at 1313-14, and is consistent only with the majority’s studied indifference to precedent binding upon this court, infra.

. The majority attempts to establish that "the jurisdictional criterion is not whether the government entity is incorporated, but whether it is acting on authority of the United States.” Majority Op. at 1315. The cases the majority cites for support involve entities that clearly fall outside the NAFI doctrine not because they deal with a corporation, but because they are funded by government appropriation. See Cherry Cotton Mills, Inc. v. United States, 327 *1329 U.S. 536, 66 S.Ct. 729, 90 L.Ed. 835 (1946) (Reconstruction Finance Corporation); National Cored Forgings v. United States, 132 F.Supp. 454 (Ct.Cl.1955) (same). The Supreme Court noted that "all of [the RFC’s] money comes from the Government; its profits, if any, go to the Government; [and] its losses the Government must bear.” Cherry Cotton Mills, 327 U.S. at 539, 66 S.Ct. 729. And Crooks Terminal Warehouses v. United States, 92 Ct.Cl. 401, 1941 WL 4578 (1941), cited in the same discussion, similarly involved a government corporation that was operated via appropriated funds. It is the funding source, not corporate structure, that is relevant to determining NAFI status.

. In the face of the most recent financial crisis, the FDIC exercised its emergency assessment powers and required its member institutions to pre-pay three years of premia to capitalize the DIF. See 74 Fed.Reg. 59056 (Nov. 17, 2009). Despite the significant strain the most recent financial crisis placed on the FDIC, the corporation did not request a loan from the Treasury.

. Moreover, in creating the FDIC, Congress specifically authorized the corporate body "to make contracts.” Banking Act of 1933, Pub.L. No. 73-66, § 8, 48 Stat. 162, 172 (codified at 12 U.S.C. § 1819); see also id. at 176 (“The Corporation may make such ... contracts as it may deem necessary in order to carry out the provisions of this section.”). *1330 But unlike the Federal Savings and Loan Insurance Corporation, the FDIC’s authorizing statute omits any statement that the FDIC is an instrumentality of the United States. Compare 12 U.S.C. § 1819(a) with 12 U.S.C. § 1725(c) (1988), repealed by FIRREA, Pub.L. No. 101-73, § 407, 103 Stat. 183, 363 (1989). And the FDIC was not given the statutory status of an "agency of the United States” until 1989, and even then only for the limited purpose of giving the federal district courts original jurisdiction over civil actions commenced by the FDIC. See 103 Stat. at 216 (codified at 12 U.S.C. § 1819(b)(1)); 28 U.S.C. § 1345.

. The majority tries to import significance to the increase in the line of credit afforded the FDIC by Congress, from $3 billion to $500 billion. Majority Op. at 1319-20. But the *1331 line of credit is a borrowing capacity granted the FDIC which must be repaid. See 12 U.S.C. § 1824(c). And the line of credit was not authorized until well-after after the creation of the FDIC.

. At this juncture, I note that the majority reinstates — in fragments — the panel opinion reported at Slattery v. United States, 583 F.3d 800 (Fed.Cir.2009). Majority Op. at 1321. Although I believe it would be best to vacate the panel opinion and allow the en banc opinion to speak unambiguously for this court, to the extent the majority intends to reinstate Parts II and III of the panel opinion, I continue to dissent from those sections because we lack jurisdiction to decide the issues presented. Though not addressed in the majority en banc opinion, to the extent the majority reinstates Part IV, I continue to concur in the decision to reverse the judgment of the Court of Federal Claims dismissing Roth’s claims, but only to the extent Roth asserts a constitutional takings claim against the Meritor receivership surplus. See Lion Raisins, Inc. v. United States, 416 F.3d 1356, 1368 (Fed.Cir.2005) ("If there is a taking, the claim is ‘founded upon the Constitution' and within the jurisdiction of the Court of Claims to hear and determine.”) (quoting United States v. Causby, 328 U.S. 256, 267, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946)).